The document below is hereby signed.

Signed: March 31, 2020



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| PIERRE PHILIPPE BARKATS, | ) | Case No. 14-00053 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| WENDELL W. WEBSTER, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 18-10021 |
| RONDI WALKER, M.D., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM DECISION AND ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Beginning in 1993, the debtor, Pierre Philippe Barkats, and

his former wife, Rondi Walker, M.D., owned a residential real

property located at 3232 Garfield Street, N.W., Washington, D.C.

(with a later changed address of 3241 Woodland Drive, N.W.,

Washington, D.C.) (the "Property") as tenants by the entirety.[1]
The plaintiff, Wendell Webster, is the trustee of the bankruptcy
estate of Barkats under Chapter 7 of the Bankruptcy Code (11
U.S.C.), in Case No. 14-00053 commenced on January 30, 2014.
Webster sold the Property for $2,850,000.00 with existing liens
to attach to the proceeds.  The principal issue remaining in this
adversary proceeding and addressed by the motions for summary
judgment addressed herein is to ascertain what were the ownership
rights of Walker and Barkats in the remaining proceeds held by
Webster.

At closing, Webster paid closing costs of $220,574.61 and
paid $179,305.95 for real estate tax liens ($181,680.63 tax liens
owed less a proration credit of $2,374.68, paid by the purchaser)
leaving him with $2,450,119.44 of proceeds of the sale of the
Property.[2]  Shortly thereafter he paid two liens that encumbered
the entire Property:

- $360,520.08 to U.S. Bank in satisfaction of a lien,
  formerly held by BB&T, for a home equity line of credit
  ("HELOC") loan; and

- $126,666.83 to Atlantic Union Bank, successor by merger

---

[1] Sometimes a tenancy by the entirety is called a tenancy
by the entireties, as in the case of D.C. Code § 16-910(b).  The
deed conveying the Property to Walker and Barkats conveyed it to
them as tenants by the entirety.

[2] See Dkt. No. 136, Ex. 24.

2

to Access National Bank, in satisfaction of a lien for

a HELOC loan made by Access National Bank.

Payment of those two liens aggregating $487,186.91 left Webster
with $1,962,932.53 as of October 16, 2019.[3]  The remaining liens
asserted by defendants in this proceeding did not reach both
interests in the Property and remain attached to the proceeds of
the sale according to the respective interests of Walker and
Barkats in the Property.  The principal remaining issue is what
is the impact of a *Marital Settlement Agreement* between Walker
and Barkats on their respective shares as ex-spouses in the
Property.

Three creditors, Francis Louvard, Francis LaGarde, and
Gregory Ingram (the "Ingram Group") hold the judgment lien (the
"Ingram Lien") against Barkats' interest in the Property.  The
Ingram Group defendants and Webster have agreed to a surcharge of
their collateral pursuant to 11 U.S.C. § 506(c), for the benefit
of the bankruptcy estate, equal to 25 percent of their secured
claim.  The Ingram Group and Webster contend that upon Walker and
Barkats being divorced the two ex-spouses each became a 50% owner
of the Property as tenants in common, and that the Ingram Lien
reaches Barkats' 50% interest in the Property.  However, the
*Marital Settlement Agreement* heavily favored Walker regarding her
and Barkats' respective shares of the proceeds of a sale of the

---

[3]  See Dkt. No. 136, Ex. 25.

3

Property.  I conclude that the that *Marital Settlement Agreement* was intended to divide the interests of Walker and Barkats in the Property and governs the shares of Walker and Barkats in the sale proceeds.  However, interpreting and then applying the *Marital Settlement Agreement* to determine the respective shares of Walker and Barkats in the proceeds is a challenging task.

I

FACTS

The basic facts advanced by the parties are not in dispute, but there is a legal issue of the effect of the *Marital Settlement Agreement* and how it is to be applied on those facts. The *Marital Settlement Agreement* is arguably ambiguous and the parties have offered little extrinsic evidence regarding the meaning of the *Marital Settlement Agreement*.  I proceed as follows assuming that there is no additional extrinsic evidence bearing on interpretation of the *Marital Settlement Agreement*.

A.  Liens on the Property

*Judgment Lien on Barkats' Interest in the Property.*  The Ingram Group defendants hold a judgment against Barkats.[4]  They

---

[4]  The judgment (a *Second Amended Judgment*) was entered on January 22, 2013, but is effective *nunc pro tunc* to February 13, 2012 (the date of an earlier *Judgment* signed February 13, 2012, that did not include attorneys' fees).  The judgment is for $788,937.62, plus accrued pre-judgment interest of $69,417.04 plus post-judgment interest at the rate of 6% per annum from February 13, 2012, until paid, plus attorneys' fees of $123,353.15, inclusive of $1,856.90 in costs.

4

recorded the judgment with the D.C. Recorder of Deeds on January 30, 2013.[5]  They thus hold a judgment lien (the "Ingram Lien") against Barkats' interest in the Property.  There are no other liens on Barkats' interest in the Property.

*Liens on Walker's Interest in the Property*.  As to Walker's interest in the Property, there are these liens on the Property, filed with the D.C. Recorder of Deeds, that were held by the Internal Revenue Service ("IRS") and others:

1.   **IRS:** tax lien filed on **August 20, 2014 at 8:32 a.m.,** for unpaid income taxes for the year 2012, standing at $181,307.89 as of November 4, 2019;

2.   **IRS:** tax lien **filed on August 20, 2014, at 2:49 p.m.,** for unpaid income taxes for the year 2013, standing at $179,578.84 as of November 4, 2019.

3.   **Democracy Capital Corporation:** Deed of Trust **filed on August 20, 2014, at 3:29 p.m.** securing a claim for $845,234.09 as of October 28, 2019, for a loan (the "Democracy Capital Loan").[6]  Walker contests the attorney fees asserted as part of this claim.

4.   **Atlantic Union Bank** (successor to Access National

---

[5]   The Ingram Group defendants recovered their initial *Judgment* (which did not include attorney's fees) in February 2012.  That *Judgment* was signed on February 13, 2012, entered on February 14, 2012, and recorded with the Recorder of Deeds on February 22, 2012.

[6]

Bank): Deed of Trust **filed on October 10, 2014**, securing a claim, originally for $150,000.00, standing at $199,482.73 as of September 4, 2019.

5.   **IRS:** tax lien **filed on July 21, 2015,** for the unpaid employment taxes for the period ending September 30, 2014, standing at $20,596.97 as of November 4, 2019.

6.   **Candela Corporation:** *Judgment* **filed on June 26, 2017,** for a judgment of $76,284.72 entered by the Superior Court of the District of Columbia on September 16, 2016.

7.   **IRS:** tax lien **filed on June 29, 2017,** for unpaid federal income taxes for the year 2014, standing at $20,934.99 as of November 4, 2019.

8.   **IRS:** tax lien **filed on November 9, 2018,** for the unpaid income taxes for the years 2015 and 2016, standing at, respectively, $36,044.20 and $10,711.30 as of November 4, 2019.

9.   **Direct Capital Corporation:** *Judgment Order* **filed on August 6, 2019,** for a judgment entered by the Superior Court on June 6, 2016, for $50,575.69 plus prejudgment interest of $738.76 and attorney's fees and costs of $1,500.00, for which Direct Capital Corporation asserts that $63,938.33 was owed as of February 5, 2020.

These liens, without taking into account additional interest, fees, late charges, and so forth, total $1,634,114.06.  Candela

6

Corporation and Direct Capital Corporation were not named as
defendants in this adversary proceeding, but Direct Capital
Corporation has filed a motion for summary judgment, which Walker
has moved to strike.

> B.   The *Marital Settlement Agreement* Addressing the
>      Property

Barkats and Walker acquired the Property in 1993 and until
their divorce continually owned the Property as tenants by the
entirety.  On April 20, 2012, Walker and Barkats executed the
Marital Settlement Agreement as part of their impending divorce,
noting that they had listed the Property for sale, and addressing
how proceeds of a sale would be divided.

*The Judgment of Absolute Divorce*.  On May 14, 2012, the
Superior Court of the District of Columbia entered a decree
titled *Findings of Fact, Conclusions of Law and Judgment of
Absolute Divorce* ("*Judgment of Absolute Divorce*") dissolving the
marriage of Walker and Barkats effective 30 days later on June
13, 2012.  The *Judgment of Absolute Divorce* incorporated the
*Marital Settlement Agreement*, and found that:

> 5.   The parties entered into a Marital Settlement
> Agreement on April 20, 2012, which resolved all issues
> between them.  **The parties have asked that their
> Agreement be incorporated, but not merged, into this
> Judgement of Absolute Divorce**.

> 6.   Three children were born to the parties during
> their marriage to each other, namely, Alek Barkats, . .
> ., Nikolai Barkats, . . ., and Kathleen Barkats . . . .
> Kathleen Barkats is still a minor.  Nikolai Barkats is
> under the age of 21 years - the age when child support

7

obligations cease in the District of Columbia.  In lieu of direct payment of child support for Kathleen and Nikolai and to provide college expense assistance for all three (3) children, the parties' Marital Settlement Agreement provides for the establishment of a trust for the benefit of the children funded from the proceeds of sale of the parties' former marital home.  The Court finds this arrangement to be an acceptable deviation from the D.C. child support guidelines.

    7.  **The parties' Marital Settlement Agreement also specifically defines and divides the parties' respective interests in their former marital home at 3232 Garfield, Street, NW, Washington, DC 20009.**

[Emphasis added.]  The *Judgment of Absolute Divorce* (at ¶ B) provided that "the parties' Marital Settlement Agreement dated April 20, 2012, be and hereby is incorporated, but not merged, into this Judgment of Absolute Divorce," and (at ¶ C) directed that the Superior Court "will maintain jurisdiction over this matter for purposes of the entry of such orders as may be necessary to implement and enforce the parties' Marital Settlement Agreement and the entry of such orders as may be necessary to protect the best interest of the parties' children."

*Terms of the Marital Settlement Agreement*.  The *Marital Settlement Agreement* included 24 paragraphs, dealing with a wide range of issues.  Paragraphs 1 through 4 and paragraph 9 are the ones most pertinent to this proceeding.

In paragraph 1, Walker and Barkats acknowledged, among other things, that the Property was "in the process of being sold at a listing price of $4,125,000.00;" agreed that the Property "shall remain listed for sale and actively marketed until sold;" and

8

agreed that if they were unable to reach agreement on price reductions, "they shall have a trustee appointed by the Court complete the sale of the property and the distribution of proceeds."

In paragraph 2, Barkats and Walker were each provided an option to purchase the other's interest in the Property, and paragraph 2 is best explained after reviewing paragraph 3.

In paragraph 3, the parties agreed how to divide the projected net sales proceeds if the Property sold for the full listing price of $4,125,000.00, as follows:

| | |
|---|---|
| Net proceeds of sale if sells for gross price of $4,125,000 less costs of sale (real estate commission, taxes, etc.) | $3,800,000 (approx.) |
| Dr. Walker shall receive | $2,000,000 (approx.) |
| <u>Plus</u> funds to pay off recent loans she has taken for living expenses and Alek's college costs | |
| $185,000 American Bank | |
| $148,000 Access National Bank Line of Credit | |
| $ 30,000 New Logic Loan | |
| $100,000 - Alek's school loans | - $463,000 |
| <u>Plus</u> Funds to establish a Trust for Children | <u>- $400,000</u> |
| Gross Balance to Mr. Barkats | $937,000 |
| DC Real Estate Taxes on 3232 Garfield Street, NW | - 30,000 |
| Less, Payoff liens (as previously agreed by parties) | - 350,000 |
| Net to Mr. Barkats | $557,000 |

The liens of $350,000 that were to be paid by Barkats were a BB&T HELOC loan (later held by U.S. Bank and paid incident to Webster's sale of the Property) and an Access National Bank mortgage for a HELOC loan (later held by Atlantic Union Bank and paid incident to Webster's sale of the Property). Walker was not

responsible for paying those liens, or the real estate tax liens
on the Property.  In other words, in a sale at $4,125,000.00 the
parties agreed that, based on projected amounts left after
selling the Property free of liens, Walker was to receive
$2,000,000 plus funds to pay off loans to her standing at
$463,000, plus $400,000 to establish a Trust for Children, for a
total of $2,863,000.  The balance of $937,000 that was left over
would go first to pay real estate tax liens standing at $30,000
and the two lenders' liens on the Property standing at $350,000,
leaving Barkats with $557,000.

After payment of all liens, $3,420,000 would be left, and
that is the projected equity in the Property (the amount that
could be realized upon a sale of the Property and paying off all
liens on the Property) upon a sale of the Property for
$4,125,000.  Of that equity of $3,420,000, Walker would receive
$2,863,000 or 83.71% and Barkats would receive $557,000 or
16.29%.

Another way of looking at this (advanced by the IRS and
Democracy Capital) is that Walker was to receive $2,863,000 or
75.34% of the $3,800,000 of projected proceeds left from a sale
for $4,125,000 after paying costs of sale and Barkats was to
receive $937,000 or 24.66% of the $3,800,000 of such proceeds.
The IRS and Democracy treat the $3,800,000 as the projected net
proceeds of a $4,125,000.00 sale.  The proceeds of $3,800,000 in

10

fact were the projected proceeds left after paying projected
closing costs: the $3,800,000 was to be prior to paying the real
estate tax liens and mortgages on the Property, and the amount to
be realized from a sale would necessarily be reduced by those
liens on the Property.  In a sale for $4,125,000, the actual
projected net proceeds would equal $3,420,000.  Out of the gross
proceeds Barkats was projected to receive, Barkats was required
to pay D.C. real estate taxes and the other liens on the
Property, so his projected $937,000 gross share of the $3,800,000
was to be encumbered by the real estate taxes and the two other
liens on the Property and he was required to pay those at closing
of the sale or beforehand.  Barkats' share should be viewed in
terms of his net share of the proceeds after paying liens on the
entire Property in comparison to Walker's share of such proceeds.
In other words, in terms of economic reality, it is more
appropriate to view the percentage shares of the ex-spouses based
on the percentage of equity in the Property left to pay liens
against only Walker or Barkats, not the percentage of net
proceeds left after paying closing costs (but not the liens
encumbering the entire Property).

Getting back to paragraph 2, it provided:

At any time before a contract of sale takes effect, Mr.
Barkats will have a one-time option to purchase Dr.
Walker's interest in the property for the $2,863,000
described below, Dr. Walker will also have a one-time
option to purchase Mr. Barkats interest in the property
as described in Paragraph 3, which will require a payment

11

of $557,000 directly to Mr. Barkats, and satisfaction of
the BB&T HELOC loan and the Access National Bank mortgage
loan with a balance of approximately $350,000, the D.C.
taxes due of $30,000 and satisfaction of all obligations
due the American Bank ($185,000), Access National Bank
line of credit loan ($148,000), New Logic Loan ($30,000),
Alek's school loans ($100,000) and placing $400,000 in
trust for the children.

In other words, Walker's interest in the Property was such that
if Barkats purchased the Property, Barkats was required to pay
Walker $2,863,000 (the amount she would receive per a sale of
$4,125,000), and he would take the Property subject to any real
estate tax liens, the BB&T HELOC lien, and the Access National
Bank HELOC mortgage.  In effect, he would be buying the Property
and the right to realize its equity of $3,420,000 by paying
Walker 83.71% of that equity in the Property.  If Walker
purchased the Property, she would be paying Barkats $557,000,
16.29% of the projected $3,420,000 equity in the Property, to
have the right to realize that projected equity.

Incident to exercising an option to purchase the Property,
Walker would be required to pay off the $463,000 in specified
loans she owed, and was required to establish the $400,000 Trust
for Children.  Walker has attached to her motion for summary
judgment two orders issued by the Superior Court in November 2013
and February 2014.[7]  In an order of November 15, 2013, the

---

[7]  Walker did not disclose that the Superior Court was later
reversed by the District of Columbia Court of Appeals with
respect to those two orders.

Superior Court noted that Walker was attempting to exercise her
option to purchase the Property, and that Walker had sought
relief from the provisions of the Agreement requiring her to pay
off loans that are in her sole name, and the requirement that she
establish a trust for the parties' children.  The Superior
Court's order:

> ORDERED that the Plaintiff may maintain rather
> than satisfy loans as necessary to exercise her option
> to purchase the Defendant's interest in the former
> marital home.  It is further

> ORDERED that the Plaintiff shall assume sole
> responsibility for educational and living expenses in
> lieu of establishing a formal children's Trust.

The order did not alter Walker's entitlement to receive $400,000
that was intended for such a Trust for Children if the Property
were sold to a third party.

In an order of February 6, 2014, the Superior Court noted
that, in entering the prior order of November 15, 2013,
addressing a purchase of the Property by Walker, its intent was
"to ensure that the Defendant shall be fully compensated for his
interest in the marital home in the amount of $557,000, his
entire **interest in the property** pursuant to the parties' Marital
Settlement Agreement."  (Emphasis added.)  In other words, the
Superior Court once again viewed the *Marital Settlement Agreement*
as dividing ownership of the Property (in this instance, a view
of the shares in the Property if Walker purchased the Property).

Barkats took an appeal docketed in the District of Columbia

Court of Appeals, Case No. 14-FM-0346.   In a *Memorandum Opinion and Judgment* of September 30, 2015, the District of Columbia Court of Appeals reversed the Superior Court and remanded the case to the Superior Court.   The Court of Appeals noted (Op. at 1) that the *Marital Settlement Agreement* "provided for the division of the marital assets and liabilities; [and that] the agreement was incorporated into, but not merged with, a judgment of absolute divorce."   The Court of Appeals further noted:

> In November 2013, the Superior Court held a hearing at which Dr. Walker presented evidence that (1) the house had not sold at the originally listed price, (2) she had obtained a loan to purchase Mr. Barkats's share of the house, and (3) she had been paying hundreds of thousands of dollars in educational and other expenses for their three children.

Op. at 3-4.   It then stated:

> Separation agreements that are incorporated into a judgment of absolute divorce but not merged into the decree, such as the settlement agreement signed by the parties in this case, are contracts; in the absence of fraud, duress, concealment, or overreaching, parties are generally bound by their terms.   *See Spencer v. Spencer*, 494 A.2d 1279, 1285 (D.C. 1985) (citing *Cooper v. Cooper*, 472 A.2d 878, 880 (D.C. 1984)).   That said, courts have some authority to modify the terms of an incorporated settlement agreement when the provision sought to be modified relates to child custody or child support.   See *Elwell v. Elwell*, 947 A.2d 1136, 1141-42 (D.C. 2008). This authority is limited, however, and requires the party seeking the modification to make a showing that (1) there has been a change in circumstances that was unforeseen at the time of the agreement, and (2) the change is both substantial and material to the welfare and best interests of the children.   *See Albus v. Albus*, 503 A.2d 1229, 1231 (D.C. 1986).

Op. at 5.   It then ruled that "Dr. Walker never proved, and the

court never found, the requisite unforeseen change in
circumstance that implicated the best interest of the parties'
children" (Op. at 6) and reversed the Superior Court and remanded
the matter to the Superior Court.  With respect to the Trust for
Children, the Court of Appeals (Op. at 7) observed that:

> between the time she signed the settlement agreement and
> the time she moved for modification of its terms, Dr.
> Walker's willingness to create a $400,000 trust for her
> children's educational expenses had changed. As she
> explained at the hearing, in that period, she had paid
> out hundreds of thousands of dollars that, had the house
> timely sold and had the trust been set up, she would not
> have had to pay. But for the reasons set forth above,
> this was not a qualifying change in circumstances.
> Moreover, although permitting the requested modifications
> may have preserved the equities, it is not clear that
> those modifications were the only way to ensure that Dr.
> Walker was reimbursed for expenses that should have been
> covered by the trust. [Footnote: **For example, we assume,
> without deciding, that Dr. Walker would be entitled to
> petition to be reimbursed from the trust, should it be
> funded, as appellant's counsel suggested in Superior
> Court.** End of footnote.]

(Emphasis added.)  Nothing in the Superior Court's orders or in
the Court of Appeals' *Memorandum Opinion and Judgment* changed the
fact that if the Property sold to a third party, the specified
loans of $463,000 were to be paid in full from the sale

15

proceeds.[8]

Walker never bought the Property pursuant to her option to purchase it.  Instead, Webster sold it at substantially less than $4,125,000.00.  Paragraph 4 of the *Marital Settlement Agreement* addressed the possibility of the Property selling for less than $4,125,000.00.  Paragraph 4 provided:

> In the event that the property sells for more or less than the full list price of $4,125,000.00, certain amounts [**Footnote:**  Dr. Walker's approximately $2,000,000,00 pay out, the children's trust amount of approximately $400,000.00, and Mr. Barkats' net payout of $557,000.00.  **End of Footnote**] in the full price agreement will be adjusted pro rata, i.e., increased or decreased by the percentage difference between the full listing price less costs of sale and the actual selling price less costs of sale.  Loans and tax bills will be paid in full.

The *Marital Settlement Agreement* required that upon a sale for less than $4,125,000.00, certain items must still be paid in full

---

[8]  The ruling of the Court of Appeals with respect to the part of the Superior Court's order regarding the requirement of the *Marital Settlement Agreement* that if Walker exercised her option to purchase the Property, there be a "satisfaction" of the specified loans does not bear on the issues presented in this adversary proceeding.  The Court of Appeals stated:

> Dr. Walker also sought the court's permission to assume responsibility for certain loans instead of paying them off in full. But the settlement agreement did not require that she retire these loans. It required that she "satisfy" Mr. Barkats's obligation as to these loans. Such "satisfaction" was achieved by relieving Mr. Barkats of any obligation to pay these debts—however that was achieved. Thus we see no need to review the court's authority to alter the settlement agreement in a manner that was unnecessary.

from the sales proceeds.  Paragraph 9 of the *Marital Settlement Agreement* provided:

> The parties agree that, with the exception of the two mortgages (HELOCS) on the marital home with BB&T and Access National Bank, which Mr. Barkats will be paying off from the proceeds of the sale/buyout of the house, the parties agree, they have no marital debt.

Moreover, paragraph 4 of the Agreement directed that "Loans and tax bills will be paid in full."  The "Loans" were listed previously under paragraph 3 of the *Marital Separation Agreement* as the $463,000 of loans Walker had taken out.  The "tax bills" Barkats had agreed to pay are the D.C. Real Estate Taxes on the Property mentioned in paragraph 3 of the *Marital Separation Agreement*.  In any event, both the two HELOC liens and whatever real estate tax liens existed on the Property would need to be paid incident to a sale in order to convey clear title.

Webster paid off the real estate tax liens and the two HELOC loans.  How to apply paragraph 4 of the *Marital Settlement Agreement* to the remaining proceeds, and whether the division of the proceeds pursuant to the *Marital Settlement Agreement* should be treated as a division of ownership of the Property, are critical remaining issues.

II

THE APPLICATION OF THE *MARITAL SETTLEMENT AGREEMENT* PROVISIONS TO WEBSTER'S SALE

Webster sold the Property for $2,850,000.00.  Closing costs charged to Webster, and before consideration of real estate taxes

17

and the HELOC liens on the Property, totaled $220,574.61.[9]
Accordingly, before paying real estate tax liens and the two
HELOC liens (required to be paid to deliver clear title to the
purchaser), and before paying the $463,000 of loans to be paid in
full, the net proceeds from the sale for $2,850,000.00 stood at
$2,629,425.39.[10]

To ascertain the respective shares of Walker and Barkats,
the difficult task is to determine "the percentage difference
between the full listing price less costs of sale and the actual
selling price less costs of sale" under paragraph 4 (requiring
that Walker's $2,000,000 share, Barkats' net payoff of $557,000,

---

[9]   These consisted of:

| | |
|---|---:|
| Title-Closing Fee | $1,500.00 |
| Title-Delivery/Copy Fees | $100.00 |
| Title-Wire Fees | $50.00 |
| Commission | $163,875.00 |
| Recording Fee | $41,325.00 |
| Recording Fee-EFC Doc. | $15.50 |
| Water Escrow | $5,000.00 |
| Washington Gas | $5,572.29 |
| PEPCO (electric) | $3,136.82 |
| **Total** | **$220,574.61** |

[10]   However, Webster has filed a *Notice* of a claim by the
purchaser for a total of $26,050.93 for damages to the Property
which did not exist when he agreed to purchase the Property, and
Webster takes the position that the damages should be paid from
Walker's share of the proceeds.  If, instead, the $26,050.93 is
treated as a retroactive cost of the sale, that would alter the
outcome.  For the moment, in order to analyze how the proceeds
will be distributed, I will disregard the purchaser's $26,050.93
damages claim.  Once the purchaser's claim is adjudicated, and it
is determined how that claim affects the shares of proceeds, I
will adjust the shares of proceeds accordingly.

and the $400,000 Trust for Children be "adjusted pro rata, i.e.,
increased or decreased by the percentage difference between the
full listing price less costs of sale and the actual selling
price less costs of sale").

Webster and the Ingram Group have not addressed how the
*Marital Settlement Agreement*, as a division of the Property, is
to be applied in light of the delay in a sale being achieved.
Their argument is that Walker and Barkats each have a 50%
ownership interest in the Property, an argument I reject later.

Limiting the "Costs of Sale" to the $220,574.61 of Closing
Costs Does Not Work.  With the closing costs of sale, **before
payment of real estate tax liens, the two HELOC liens, and
outstanding loans to Walker**, being only $220,574.61, the net
proceeds of the $2,850,000.00 sale were $2,629,425.39, which is
69.1954% of the anticipated net proceeds of $3,800,000.00 (before
payment of real estate tax liens, the two HELOC liens, and the
$463,000 in loans to be paid in full) if the Property had sold
for $4,125,000.00.  If only that $220,574.61 were treated as the
"costs of sale" as that term is used in paragraph 4, the "costs
of sale" would not include the "Loans and tax bills [that] will
be paid in full," or the two HELOC liens that Barkats was
supposed to pay.  That would produce an impossible result for the
following reasons.

If "costs of sale" are $220,574.61, the net proceeds after

"costs of sale" would be $2,629,425.39 or 69.1954% of the
projected $3,800,000.00 of net proceeds had the Property sold for
$4,125,000.00.  Then, 69.1954% would be "the percentage
difference between the full listing price less costs of sale and
the actual selling price less costs of sale."  The projected
payouts in a sale at $4,125,000 of $2,000,000.00 to Walker,
$400,000.00 for the Trust for Children, and $557,000 for Barkats
would be reduced to:

- 69.1954% of the $2,000,000.00 figure, which equals
  **$1,383,908.00** for Walker;

- 69.1954% of the $400,000.00 figure, which equals
  **$276,781.60** for the Trust for Children; and

- 69.1954% of the $557,000.00 figure, which equals
  **$385,418.38** for Barkats.

Those total $2,052,107.98.  Walker would also receive $463,000.00
for the specified loans.  So the required disbursements would
total $2,509,107.98:

$1,383,908.00  (Walker before adding in specified loans);

  $276,781.60  (Trust for Children);

  $385,418.38  (Barkats);

  $463,000.00  (to Walker for specified loans)
**$2,509,107.98  TOTAL**

That produces an impossible result: after being used to pay
closing costs, the real estate tax liens, and the two HELOC
liens, the $1,962,932.53 of remaining sale proceeds would not

20

suffice to pay $2,509,107.98.  That reading just does not work.

    To elaborate, sale proceeds net of closing costs are
$2,629,425.39, but those proceeds were used first to pay real
estate tax liens chargeable to Webster (which were $179,305.95
after a proration to the buyer) and the two HELOC liens (totaling
$487,186.91).  That reduced the sales proceeds available for
distribution to Walker and Barkats (the equity in the Property)
to $1,963,279.94, which does not suffice to pay Walker and
Barkats $2,505,107.98.

    The "Costs of Sale" Addressed in Paragraph 4 of the _Marital
Settlement Agreement_ Must Include the Items that the _Marital
Settlement Agreement_ Contemplated Would be Paid in Full.  The
foregoing demonstrates that the term "costs of sale" in paragraph
4 not be limited to the $220,574.61 of closing costs, but must
also include the "Loans and tax bills [that] will be paid in
full," and the two HELOC liens that were to be paid in full.  In
other words, common sense dictates that the _Marital Settlement
Agreement_ be interpreted as requiring that the amounts to be paid
as shares for Walker, the Trust for Children, and Barkats, be
adjusted proportionately based on what was left after other
amounts required to be paid in full were paid.  The tax liens,
the $463,000 of loans Walker had incurred, and the existing liens
on the Property were amounts that had to be paid regardless of
the sales price.  The parties were agreeing, however, that

Walker's $2,000,00 share, the $400,000 Trust for Children figure, and Barkats' $557,000 net share would necessarily be adjusted pro rata based on what were the results of paying the tax liens, the loans Walker had incurred, and the existing HELOC liens on the Property.

As noted previously, the *Marital Settlement Agreement* contemplated a sale at $4,125,00.00 with net proceeds of $3,800,000.00, and effectively determined the aggregate amounts to be paid to Walker, the Trust for Children, and Barkats by reducing the $3,800,000 as follows:

| | |
|---|---|
| Net sales proceeds: | $3,800,000.00 |
| Less $30,000 tax tax liens: | ($30,000.00) |
| Less $350,000 for two HELOC liens: | ($350,000.00) |
| **Total** | **$3,420,000.00** |

Then the *Marital Settlement Agreement* required that the $3,420,000.00 would be distributed as follows:

| | |
|---|---|
| Walker: | $2,000,000.00 |
| Walker for Loans: | $463,000.00 |
| Walker for Trust for Children: | $400,000.00 |
| Barkats: | $557,000.00 |
| **Total** | **$3,420,000.00** |

For any other sale, paragraph 4 of the *Marital Settlement Agreement* was requiring that a pro rata reduction of three figures: Walker's $2,000,000 share, the Trust for Children's

22

$400,000 share, and Barkats' $557,000 share (the "certain amounts in the full price agreement [that] will be adjusted pro rata" as specified in paragraph 4) that were projected to transpire if the Property had been sold for $4,125,000.00.

Accordingly, *as to Webster's sale*, in determining Walker's and Barkats' shares of the proceeds, paragraph 4 of the *Marital Settlement Agreement* requires certain items to be paid without regard to the sale price achieved, with only three items to be altered: Walker's share, the Trust for Children's share, and Barkats' share.  The items required by paragraphs 4 and 9 of the *Marital Settlement Agreement* to be paid in full are the two existing HELOC liens (the BB&T HELOC lien later held by U.S. Bank and the Access National Bank HELOC lien later held by Atlantic Union Bank) standing at $487,186.91 when paid by Webster, the $463,000 in identified loans, and real estate tax liens of $179,305.95.  These are items to be paid without any adjustment by reason of any reduction in the sale price.

The Specified Loans to be Paid.  Paragraph 4 of the *Marital Settlement Agreement* makes clear that the loans to Walker listed earlier standing at $463,000.00 were to be paid.  In other words, Walker was to receive funds towards payments of loans she owed standing at $463,000.00.  One of the listed loans was $185,000 for American Bank.  On August 1, 2014, Democracy Capital made a $550,000 loan to Walker (the "Democracy Capital Loan"), secured

by Walker's interest in the Property.[11]  Of that loan,

$324,659.08 was used to satisfy the prior loan to American Bank,

and, after various other charges to Walker, $139,216.79 was cash

received by Walker.[12]  In sum, the $185,000 loan to Walker from

American Bank was effectively incorporated into the Democracy

Capital Loan at the increased amount of $324,659.08, and became

subject to the terms of the Democracy Capital Loan regarding such

things as the interest rate and the maturity date.  Walker

granted Democracy Capital a lien on Walker's interest in the

Property, the lien that Democracy Capital now asserts against

---

[11]  Webster points to this recital in the deed of trust
granted to secure the Democracy Capital Loan and signed by Walker
as grantor:

> WHEREAS, Grantor is the owner of an undivided fifty
> percent (50%) tenant in common interest in the Land (as
> hereinafter described) and desires herein to secure to
> the Beneficiary and any subsequent holder of the Note
> its interest in the Land as further collateral security
> for the Loan . . . .

However, that representation of having a 50% interest was a
mistake and is not binding on Walker.  The lien extended to
Walker's entire "interest in the Land," and thus Democracy
Capital's lien attached to whatever is Walker's interest in the
Property.

[12]  Webster argues (Dkt. No. 146 at 7) that "Dr. Walker
received additional loan proceeds in the amount of $139,216.
This additional loan to Dr. Walker was based upon the value of
the Property and must be taken into account in arriving at the
appropriate allocation of sales proceeds between the Debtor and
Dr. Walker."  That argument makes no sense.  The $139,216 was
secured by a lien on *Walker's* interest in the Property and was
not cash taken out of the entirety of the Property.

Walker's share of the sale proceeds.[13]    In other words, by the
time the sale of the Property occurred, the loans to be repaid
first from the sale proceeds had increased by at least
$139,659.08, the difference of $324,659.08 less the original
amount of $185,000.00.  Instead of $185,000 being owed on the
American Bank Loan, $324,659.08 (or a higher amount in order to
take account of interest that would otherwise have accrued had
Walker not paid it herself) was owed and would need to be paid as
the amount owed on the American Bank Loan.  The other loans
likely also increased.  However, for purposes of analysis, I will
assume without deciding that all of the loans, including the
American Bank Loan, bore no interest and the aggregate amount
stood at $463,000.

    Resulting Distributions.  Accordingly, the proceeds of
Webster's sale of the Property that are to be divided, after
taking into account charges that the *Marital Settlement Agreement*
requires to be paid regardless of the sale price, were
$1,500,279.94, derived as follows:

---

[13]    In holding that the amount of the American Bank
obligation must be a reduction of the sale proceeds before
dividing up the proceeds between Barkats and Walker, and
providing for payment of Democracy Captial's lien (for paying off
the American Bank lien as well as new amounts lent), that is not
a case of conferring the same benefit on Walker twice.  Instead,
the court is fixing the interest of Walker in the sale proceeds
(including funds to satisfy the $463,000 of loans) and then her
creditors can chase the proceeds.  Democracy Capital is simply
one of her creditors who happens to have a lien it is able to
assert against the proceeds.

| Sale Price: | $2,850,000.00 |
|---|---|
| Less Costs of Sale: | ($220,574.61) |
| Less Tax Liens: | ($179,305.95) |
| Less Two HELOC Liens: | ($487,186.91) |
| Less Loans to be Repaid | ($463,000.00) |
| **Total** | **$1,499,932.53** |

The $463,000.00 is for debts that only Walker owed and should be treated as part of her interest in the Property arising from the divorce.  In effect, the *Marital Settlement Agreement* imposed an equitable charge against the Property that was required to be paid in full.

The $1,499,932.53 figure is the amount that ought to be allocated proportionately to the three figures (Walker's $2,000,000 share, the Trust for Children's $400,000 share, and Barkats' $557,000 share) that were to be adjusted proportionately in comparison to what was projected to transpire if the Property had been sold for $4,125,000.00.  As noted previously, if the Property had sold for $4,125,000.00 the *Marital Settlement Agreement* contemplated that after paying the HELOC liens, the specified loans of $463,000, and real estate taxes, net proceeds

of $2,957,000.00 would result and would be distributed as

follows:

| | | |
|---|---|---|
| Walker: | $2,000,000.00 | = 67.636% |
| Trust for Children: | $400,000.00 | = 13.527% |
| Barkats: | $557,000.00 | = 18.837% |
| **Total:** | **$2,957,000.00** | |

The $400,000 in funds for the Trust for Children were to be paid

to Walker, and she was thus entitled to payment of the specified

loans she owed plus 81.163% of the remaining proceeds after

payment of real estate tax liens and the two HELOC liens.  In the

case of Webster's sale, the proceeds remaining after paying real

estate tax liens, the two HELOC liens, and $463,000 for loans

owed by Walker are $1,499,932.53, to be allocated proportionately

to Walker (on her previously projected $2,000,000 share), the

Trust for Children's (on its previously projected $400,000

share), and Barkats' (on his previously projected $557,000

share), with the result that:

- **Walker's share** should be 67.636% of $1,499,932.53 = **$1,014,494.37;**

- **the share for the Trust for Children** should be 13.527% of $1,499,932.53 = **$202,895.87;** and

- **Barkats' share** should be 18.837% of $1,499,932.53 = **$282,542.29.**

The funds for the Trust for Children were to be paid to Walker.

27

Accordingly, Walker should receive $1,680,390.24 ($463,000 for loans; $1,014,494.37; and $282,542.29 for the Trust for Children).[14]  Barkats will receive only $282,542.29.

The $1,499,932.53 figure is net of the $463,000 in loans. If the proceeds of $1,499,932.53 are increased to include the $463,000.00 to be paid to Walker for loans, that brings the total proceeds being divided up to $1,962,932.53 (representing the equity in the Property after paying real estate tax liens and the two HELOC liens).  Walker's receipt of $1,680,390.24 would equal 85.6061% of the equity and Barkats receipt of $282,542.29 would equal 14.3984% of the equity.  It was projected that if the Property sold for $4,125,000.00 Walker would receive 83.71% of the projected equity in the Property (for herself and the Trust for Children) and Barkats would receive 16.29% of the projected equity .  However, that difference in percentage shares of the equity is because the $463,000 in student loans were not reduced based on the lower sale price whereas Walker's $2,000,000 share, the Trust for Children of $400,000, and Barkats' $557,000 share were all reduced proportionately.  The point is that regardless of the sale price, Walker was entitled to at least 83.71% of the

---

[14]  If the specified loans totaling $463,000.00 bore interest and stood at more, Walker's share would be more, but $1,477,729.34 is the minimum amount to which Walker is entitled. The amount might be higher if the loans to be paid (loans incurred by Walker that Barkats agreed were to be paid in full) were higher than $463,000 by reason of interest accruals.

28

equity (for herself and for the Trust for Children).

In sum, the *Marital Settlement Agreement* provides that
Walker receive full payment of the specified loans of $463,000
she owes, and after that payment and payment of the real estate
tax liens and the two HELOC liens, she was to receive 81.163% of
the remaining proceeds (67.636% for her self and 13.527% for the
Trust for Children).

It is not possible to arrive at a final figure without
knowing how much was owed after the *Marital Settlement Agreement*
on the $463,000 in loans Walker owed by reason of interest
accruals. She does not appear to be responsible for the delay:
once the bankruptcy case intervened in January 2014 she could not
sell the Property, both her interest and Barkats' interest,
unless authorized by an order of this court. She even attempted
to purchase the Property but Barkats obtained a reversal of the
orders she had obtained from the Superior Court to facilitate
such a purchase. Although she objected in this court to
Webster's sale, arguing that the price was inadequate, that was
her right, as it would have been had the bankruptcy case not
intervened and, as contemplated by the *Marital Settlement
Agreement*, a trustee had been appointed by the Superior Court to
sell the Property if the ex-spouses could not agree on a sale.

We know that one of the specified loans (the American Bank
Loan listed in the amount of $185,000) had increased to

29

$324,659.08 when it was satisfied via the new Democracy Capital loan Walker took out on August 1, 2014.  The *Marital Settlement Agreement* contemplated that Walker would be paid the amount of the American Bank Loan, and it is appropriate to treat her as entitled to a minimum of $324,659.08 from the sale proceeds as the amount of the American Bank Loan.  If Walker had not paid the American Bank Loan, interest would have continued to accrue on the American Bank Loan for the five years that passed before Webster sold the Property, but it is impossible to discern from the current record the amount of interest that would have accrued.[15]

The same is true of the $148,000 Access National Bank Loan (now owed to Atlantic Union Bank) standing at $199,482.73 as of

---

[15]  The Democracy Capital Loan closed and disbursed on August 1, 2014, for a principal amount of $550,000.00 that, after closing costs, was used to satisfy an earlier unsecured loan from American Bank which had a balance of $324,659.08 as of the closing of the Democracy Capital Loan, and to provide Walker $139,216.79 cash at closing.  The parties have not provided information regarding what amount would have been owed on the American Bank Loan at the time of Webster's sale of the Property had the American Bank Loan not been paid off as part of the Democracy Capital Loan transaction.  Although the Democracy Capital Loan's promissory note is in the record, the record contains no information regarding the interest rate on the original unsecured loan from American Bank and the late fee for any late payment on that loan.  Accordingly, the balance owed on the Democracy Capital Loan promissory note cannot be used to ascertain where the American Bank Loan would stand had the American Bank Loan not been paid off.  Moreover, part of the $550,000.00 Democracy Capital Loan was for closing costs that had not existed with respect to the original unsecured loan from American Bank.

September 4, 2019.  The Marital Settlement Agreement contemplated that Walker would be paid the amount of the Access National Bank Loan, and it is appropriate to treat her as entitled to a minimum of $199,482.73 from the sale proceeds as the amount of the Access National Bank Loan.

I will adjust my prior calculations to take into account Walker's entitlement to at least $324,659.08 for the American Bank Loan, not just $185,000.00, and at least $199,482.73 on the Access National Bank Loan, not just $148,000.  That is an increase of $191,141.81 regarding the specified loans of $463,000.00 which were to be paid in full, thus increasing the $463,000.00 figure to $654,141.81.[16]  The first step is to calculate the amount left after paying all of the amounts that had to be paid in full:

| | |
|---|---|
| Sale Price: | $2,850,000.00 |
| Less Costs of Sale: | ($220,574.61) |
| Less Tax Liens: | ($179,305.95) |
| Less Two HELOC Liens: | ($487,186.91) |
| Less Loans to be Repaid | ($654,141.81) |
| **Total** | **$1,317,790.72** |

That $1,317,790.72 figure must be allocated proportionately to

---

[16]  This assumes that the other two loans specified, the New Logic Loan of $30,000 and Alek's school loans of $100,000) had remained the same and that the amounts listed were accurate as of the execution of the *Marital Settlement Agreement*.  Without further evidence, the record justifies treating those assumptions as accurate.

the three figures (Walker's $2,000,000 share, the Family Trust's $400,000 share, and Barkats' $557,000 share) that were to be adjusted proportionately in comparison to what was projected to transpire if the Property had been sold for $4,125,000.00.  That results as follows:

- **Walker's share (exclusive of the $652,141.81 for specified loans)** should be 67.636% of $1,317,790.72 **= $891,300.93;**

- **the share for the Trust for Children** should be 13.527% of $1,317,790.72 **= $178,257.55;** and

- **Barkats' share** should be 18.837% of $1,317,790.72 **= $248,232.24.**

Aside from receiving $178,257.55 for the Trust for Children, Walker is entitled to receive $1,545,442.74 ($891,300.93 outright and $654,141.81 for the specified loans).  That $1,545,442.74 should readily suffice to pay the first five liens on Walker's share of the proceeds.  Those liens (the first two IRS tax liens, Democracy Capital's lien, the Atlantic Union lien, and the next IRS tax lien) stood at a total of $1,405,603.55 last fall and ought not exceed $1,544,795.46 now.  The $1,545,442.74 might also suffice to pay Candela's lien (if it attached to the proceeds – more about that later) and part of the remaining IRS tax liens.

If Walker is entitled in her own right to receive the $178,528.09 for the Trust for Children by way of credits for the

alleged hundreds of thousands of dollars she spent on the
children's educations, then Walker is entitled to receive at
least $1,723,323.55.  That would come close to sufficing to
satisfy the liens against her interest in the Property that are
listed above as standing at $1,634,114.06 (but on which
additional charges have accrued).

### III

THE *MARITAL SETTLEMENT AGREEMENT* WAS A DIVISION OF PROPERTY

The Ingram Group defendants, joined by Webster, contend that
the *Marital Settlement Agreement* allocated proceeds from the
proceeds of an eventual sale of the property but did not divide
their respective ownership interests in the property itself.
Consequently, the parties' divorce converted the spouses' tenancy
by the entirety ownership of the Property into a tenancy in
common, with each of the ex-spouses holding a 50% interest in the
Property.  The Ingram Group defendants correctly note that
although the Ingram Lien did not attach to the Property when it
was owned tenancy by the entirety, the divorce terminated the
tenancy by the entirety ownership, and the Ingram Lien attached
to whatever interest Barkats had after the divorce.  However, I
reject their argument that termination of the tenancy by the
entirety ownership resulted in Barkats holding a 50% interest in
the Property.  Instead, the *Marital Settlement Agreement* provides
for an alternative division of interests in the Property that is

33

more generous to Walker.

In this case, the disposition of tenancy by the entirety
property upon a divorce is governed by D.C. Code Ann. § 16-910
(2001), as amended in 2006 and 2007,[17] to provide:

> Upon entry of a final decree of . . . divorce . . . **and
> the filing of a petition for relief available under this
> section**, in the absence of a valid antenuptial or
> postnuptial agreement resolving all issues related to the
> property of the parties, the court shall:
>
>     (a) [Paragraph dealing with sole and separate
> property];
>
>     (b) value and distribute all other property and debt
> accumulated during the marriage or domestic partnership
> that has not been addressed in a valid antenuptial or
> postnuptial agreement or a decree of legal separation,
> regardless of whether title is held individually or by
> the parties in a form of joint tenancy or tenancy by the
> entireties, in a manner that is equitable, just, and
> reasonable, after considering all relevant factors . . .
> .

[Emphasis added.]  In the absence of a valid antenuptial or
postnuptial agreement, addressing the division of entirety
property upon their being divorced, one of the spouses may file a
petition to invoke § 16-910(b) under which the Superior Court
must "value and distribute" the property "in a manner that is
equitable, just, and reasonable, after considering all relevant
factors . . . ."  In light of the amended version of § 16-910,
the Superior Court was not required to find that the *Marital*

---

[17]   See Domestic Partnership Equality Amendment Act of 2006,
2006 D.C. Law 16-79 (Act 16-265) § 4(d)(1) (Apr. 4, 2006);
Technical Amendments Act of 2006, 2006 D.C. Law 16-191 (Act 16-
745) § 131(b)(1) (Mar. 7, 2007).

*Settlement Agreement* was a valid agreement unless one of the spouses challenged the *Marital Settlement Agreement*'s validity and filed a petition seeking a different division of the Property.[18]

When the Superior Court must make a division of property under § 16-910(b), "[t]he requirement that the court distribute property 'in a manner that is equitable, just and reasonable, after considering all relevant factors' does not mean that marital property must be divided equally." *In re Hope*, 231 B.R. at 414 (citing *Burwell v. Burwell*, 700 A.2d 219 (D.C. 1997); *Barbour v. Barbour*, 464 A.2d 915 (D.C. 1983)). In lieu of petitioning the Superior Court to make a division of property, § 16-910 allows the spouses to enter into an agreement "to deal with their property as they wish." *Alves v. Alves*, 262 A.2d 111, 118 (D.C. 1970). The Superior Court determined that Walker and Barkats had done precisely that. The divorce decree incorporates

---

[18]   Previously, § 16-910 contemplated that incident to a divorce, the Superior Court must adjust and apportion the spouses' property rights or determine that a valid agreement existed that already did so. *See In re Hope*, 231 B.R. 403, 413 n.15 and 413-14 (Bankr. D.D.C. 1999). That was no longer true when Walker and Barkats divorced. Accordingly, Atlantic Union Bank errs in arguing:

> The Family Court was required under D.C. Code Ann. § 16-910(b) to find that there was a valid agreement disposing of the Marital Home and it was that finding that relieved the Family Court of the statutory requirement of conducting the equitable distribution analysis of the parties' interests the Marital Home required in the absence of such an agreement.

the *Marital Settlement Agreement* and states that the "Marital
Settlement Agreement specifically **defines and divides** the
parties' respective interests in their former marital home."
(Emphasis added.)

The Superior Court's jurisdiction over the divorce
proceeding was sufficiently broad to permit it to declare the
*Marital Settlement Agreement* a valid agreement; to declare that
the *Marital Settlement Agreement* divided the Property between
Walker and Barkats; and to incorporate the *Marital Settlement
Agreement* into the *Judgment of Absolute Divorce* (as desired by
Walker and Barkats) as a division of the Property enforceable by
the Superior Court pursuant to its expressly retained
jurisdiction.

Section 16-910 allowed Barkats and Walker to determine
between themselves what was equitable.  In *In re Hope*, 231 B.R.
at 410, the parties' agreement directed that "the equity in the
property shall become the sole property of the wife."  Obviously
equity would not be realized unless there were a sale.  That the
equity would come into play only upon a sale did not mean that in
the meantime the property was owned by the spouses with equal
ownership shares as tenants in common.

So too here, the *Marital Settlement Agreement* defines what
interests the two spouses still had in the Property.  It did so
in a way that favored Walker.  However, instead of stating that

36

"the equity in the property shall become the sole property of the wife" as in *In re Hope*, paragraph 3 entitled Walker to proceeds in an amount equal to 83.71% of the projected equity of $3,420,000 in the Property.  That the parties were attempting such a division of interests is further evident from paragraph 2, which provided that Walker could purchase Barkats' interest for an amount equal to the remaining 16.29% of projected equity and entitled Barkats to purchase Walker's share for an amount equaling 83.71% of the projected equity.[19]

The *Marital Settlement Agreement* further provided that upon the Property being sold for less than $4,125,000, and whatever the price, Walker would receive (for herself and for the Trust for Children) at least 83.71% of the equity in the Property. (The parties were dividing up the Property as tenants by the entirety property that was subject to only liens for joint debts. The Ingram Lien, which did not attach to the Property as tenants by the entirety property, does not count for purposes of calculating the tenants by the entirety equity that was being divided up.)  Accordingly, the *Marital Settlement Agreement* and the divorce decree must be interpreted as treating the spouses as

---

[19]  This provision allows for disposition of the Property without resort to a sale.  Thus, the contention that the *Marital Settlement Agreement* only provides for the allocation of the *proceeds* upon a sale of the Property must be rejected, because the *Marital Settlement Agreement* does not require a sale of the Property that would generate proceeds to be allocated at all.

37

having different interests in the Property.   Walker would receive
slightly more than 83.71% because Barkats committed that the
loans Walker had taken out would be paid in full regardless of
the sale amount.   Accordingly, the interests might be variable as
time went by before the Property was sold (because specified
loans to Walker might have increased by reason of interest
accruals).[20]   However, that does not change the fact that the
spouses treated themselves as not owning equal shares of the
Property, but instead shares pursuant to the formulas set forth
in the *Marital Settlement Agreement* to be realized upon a sale of
the Property.

The current dispute regarding what respective shares of the
sales proceeds Walker and Barkats are entitled to amounts to
applying the remedy of partition of the Property via a sale and
distribution of the proceeds.   When in a divorce the parties
agree to a sale of a tenancy by the entirety property, or the
Superior Court requires a sale if there is no agreement, that
amounts to a partition in which the court must make an equitable
division of the proceeds of the sale of the real property between
the two former spouses, and D.C. Code § 16-910 controls in that

---

[20]   Even if the interests in the Property were treated as
fixed, the provisions in paragraphs 2 and 3 would govern and
require an approximately 83.71/16.29 division of interests, with
Barkats committing to compensate Walker from the share of
proceeds owing to his interest to compensate Walker for increased
amounts owed on the Walker-specified loans.

regard, *Hairston v. Hairston*, 454 A.2d 1369, 1371-72 (D.C. 1983).
The equitable division under § 16-910 and does not necessarily
result in a 50/50 split of the property.  Under § 16-910(b)(2),
had Walker and Barkats sought to have the Superior Court make a
division of the Property, the Superior Court would have been
required to consider, as one factor, the "needs of each of the
parties."  Obviously an increase, upon the completion of a sale,
in the outstanding debts owed by Walker at the time of the
divorce, would have been a factor the Superior Court would have
weighed if it had been called upon to partition the property and
to make an equitable distribution of the Property via a
distribution of the sales proceeds.  Instead, the *Marital
Settlement Agreement* already decided what would be an equitable
distribution of the Property via a sale (through a court-
appointed trustee if necessary) and it included paying in full
the specified loans that Walker had incurred.

      Moreover, although this is a case of contract
interpretation, the intent of the *Marital Settlement Agreement*
must be assessed in light of its attempting to achieve an
equitable distribution that otherwise a spouse could petition the
Superior Court to fix, with the equitable considerations
including such marital law issues as addressing the needs of
children and assuring that Walker received a share to address her
financial needs.

39

The Ingram Group defendants note that Walker and Barkats did
not record a deed with the Recorder of Deeds reflecting their new
ownership interests in the Property.  However, nothing in
District of Columbia law requires that a division of a real
property between ex-spouses pursuant to a valid and enforceable
marital settlement agreement or a decree of the Superior Court in
a divorce proceeding must be reflected by a deed recorded with
the Recorder of Deeds.

The Ingram Group defendants also argue that Walker and
Barkats had equal rights in the Property during their marriage.[21]
However, the extent of the spouses' respective rights in the
Property during the marriage is irrelevant.  The Ingram Group
judgment was not a lien on Barkats' interest in the tenancy by
the entirety estate.  *American Wholesale Corp. v. Aronstein,* 10
F.2d 991, 992 (1926).  *See also In re Wall's Estate*, 440 F.2d
215, 219 (D.C. Cir. 1971); *Morrison v. Potter*, 764 A.2d 234, 236
(D.C. 2000) (referring to "an inability of one spouse to alienate
his interest," and citing *In re Wall*'s *Estate*, 440 F.2d at 219);
*Clark v. Clark*, 644 A.2d 449, 450 (D.C. 1994), quoting 4A Richard
R. Powell, The Law of Real Property ¶ 620[3] (1991):

---

[21]   It is well recognized that "tenants by the entireties
own a unitary interest in the whole property," *Parker v. U.S. Tr.
Co.*, 30 A.3d 147, 153 (D.C. 2011).  "[E]ach [spouse] is entitled
to the enjoyment and benefits of the whole and neither has a
separate estate therein," although "the rights of each spouse are
regarded as equal to the other's."  *Fairclaw v. Forrest*, 130 F.2d
829, 833 (D.C. Cir. 1942).

40

> Because the husband and wife were considered one person, a true form of concurrent ownership between them was not conceptually possible; the tenancy by the entirety, in which the property was held in its entirety—without undivided shares—by the marital unit of husband and wife, was the only tenancy by which husband and wife could concurrently hold land.

The Ingram Group concedes that its judgment lien did not attach to Barkats' interest in the Property as a tenant by the entirety. So long as the tenancy by the entirety estate existed, the Ingram Lien was void. *See Malek v. Flagstar Bank*, 70 F. Supp. 3d 23, 29 (D.D.C. 2014) ("A mortgage entered into by one spouse that purports to be secured by property owned by the couple, as tenants by the entirety, is void because it was not executed by both spouses and creates a cloud upon the title to the property. *See* 78 A.L.R. 24 (Originally published in 1932) (collecting cases).").

Accordingly, if Barkats had conveyed by deed his interest in the Property to Walker during their marriage, the Ingram Lien would not be a lien on the Property owned by Walker upon the divorce of Walker and Barkats. *Aronstein*, 10 F.2d at 992; *Clark*, 644 A.2d at 453 (conveyance by husband to wife of his interest extinguished his interest in the tenancy by the entirety property). Here, the *Marital Settlement Agreement* was entered into *before* the divorce took effect, and incorporated into the *Judgment of Final Divorce*. If it divided the Property, it does not matter what rights Walker and Barkats had in the Property

41

when they were married: the Ingram Lien only attached to whatever interest Barkats had in the Property after the divorce, and that was governed by the *Marital Settlement Agreement*.

Finally, the Ingram Group argues that *Martin v. Roberts*, 628 S.E.2d 812 (N.C. App. 2006), demonstrates that Barkats obtained a 50% interest in the Property upon the divorce and that the Ingram Lien attached to that interest in the Property.  However, the two pertinent holdings of that decision are distinguishable or conflict with District of Columbia law.

One of the holdings in *Martin* was that a couple's divorce immediately converted their tenancy by the entirety property into a tenancy in common with each spouse having an equal share, with the ex-husband's 50% tenancy common interest becoming subject to the plaintiff's judgment lien against the ex-husband.  In reaching that conclusion, the court relied upon two prior decisions, *Union Grove Milling and Manufacturing Co. v. Faw*, 103 N.C. App. 166, 404 S.E.2d 508 (1991), and *Branch Banking & Tr. Co. v. Wright*, 74 N.C. App. 550, 553, 328 S.E.2d 840, 842 (1985).

In *Faw*, the equitable distribution award was decreed *after* the parties' divorce took effect and had resulted in a 50/50 division.  Here, the *Marital Settlement Agreement* was executed before the divorce and incorporated into the Judgment of Absolute Divorce before the divorce became effective, and thus *Faw* is distinguishable.

42

*Wright* is at variance with District of Columbia law.  In *Wright*, a husband granted a mortgage against a property held with his wife as tenants by the entirety.  The court of appeals held that upon the parties' divorce, the former spouses each obtained a 50% interest in the property as tenants in common, and that when the former wife acquired the property through an equitable distribution award, she took title to the property subject to the mortgage on the 50% interest of her former husband.  Significantly, the court held:

> [U]nder the language of our statute which states that "equitable distribution of property shall follow a decree of absolute divorce" (emphasis added), G.S. 50-21(a), the estate of a tenancy in common of necessity intervenes between absolute divorce and award of title pursuant to equitable distribution when property was held by the entireties.  This is so whether or not the divorce and the equitable distribution occur in a single proceeding.

*Wright*, 328 S.E.2d at 842.

The law of the District of Columbia is different.  When the Superior Court divides tenancy by the entirety property of spouses pursuant to a divorce decree, "title vests immediately after the divorce in the proper parties and there is no need for an interim allocation of interests as tenants in common."  *Argent v. Argent*, 396 F.2d 695, 698 (D.C. Cir. 1968).  The Court of Appeals viewed the statute as operating that way even though the statute, at that time, provided:

> Upon the entry of a final decree of annulment or absolute divorce, in the absence of a valid antenuptial or postnuptial agreement in relation thereto, **all property**

43

> **rights of the parties in joint tenancy or tenancy by the
> entirety shall stand dissolved** and, in the same
> proceeding in which the decree is entered, the court may
> award the property to the one lawfully entitled thereto
> or apportion it in such manner as seems equitable, just,
> and reasonable.

[Emphasis added.] The Ingram Group notes that in *Travis v.
Benson*, 360 A.2d 506, 509 (D.C. 1976), the court stated that
"[t]he entry of a final divorce decree dissolves the tenancy by
the entirety and converts it into a tenancy in common." However,
the Superior Court's decree or the parties' agreement governs
what interests the parties have as tenants in common. Moreover,
the observation in *Travis* was dicta because the court held that
"the property settlement agreement expressly provides that the
property would continue to be held by the parties as tenants by
the entirety." *Id.* In any event, the statute no longer provides
that the tenancy by the entirety stands dissolved. Instead, it
provides for a spouse to petition for the property to be divided
between the parties pursuant to the divorce decree or
alternatively that the parties may agree to a division of the
property. If the parties do not agree to a division and do not
petition the Superior Court for a division, then the common law
rule would arguably apply to treat the tenancy by the entirety as
dissolved and converted to a tenancy in common with both parties
having ownership of 50% of the property. But that is not our
case. In other words, pursuant to District of Columbia law,
property is not necessarily divided in equal halves as tenants in

44

common upon a divorce. *In re Hope*, 231 B.R. at 414. Instead,

pursuant to D.C. Code, § 16-910, the parties' interests in

property are determined by agreement, or in such amounts as the

court determines equitable. *Id.* at 414-15; *Hairston*, 454 A.2d at

1371. There is no 50/50 presumption.

The decision in *Martin* addressed a second issue. The

husband and wife entered into a *Consent Order* in January 1997

prior to their divorce in March 1998, with the *Consent Order*

calling for the husband to convey his interest within 30 days

upon the filing of the *Consent Order*. After the divorce, the

former husband did not convey the property to his former wife

until November 1998. The court addressed whether the *Consent

Order* could be treated as effecting a conveyance of the property

from the husband to the wife, thus ending the tenancy by the

entirety and vesting the wife with full title that could be not

be reached by the judgment lien creditor. The court acknowledged

two statutory provisions in regard to the issue of whether there

had been a conveyance:

> N.C. Gen. Stat. § 50-20(g) (2005) (with regards to the
> distribution by the court of marital and divisible
> property, "[i]f the court orders the transfer of real or
> personal property or an interest therein, the court may
> also enter an order which shall transfer title, as
> provided in G.S. 1A-1, Rule 70 and G.S. 1-228."); N.C.
> Gen.Stat. § 1-228 (2005) ("Every judgment, in which the
> transfer of title is so declared, shall be regarded as a
> deed of conveyance, executed in due form . . . and shall
> be registered in the proper county, under the rules and
> regulations prescribed for conveyances of similar
> property executed by the party. The party desiring

45

> registration of such judgment must produce to the
> register a copy thereof, certified by the clerk of the
> court in which it is enrolled, under the seal of the
> court, and the register shall record both the judgment
> and certificate.").

*Martin*, 628 S.E.2d at 816.  The court concluded that the *Consent*

*Order* was insufficient to constitute a conveyance of defendant's

interest in the real property held as a tenancy by the entirety:

the *Consent Order* called for the husband to convey his interest

within 30 days, and he did not do that; the order failed to

provide a legal description of the real property which was to be

conveyed, and it did not state the location of the property; and

the *Consent Order* was not recorded in the land records.  In

short, the court held, "the Consent Order entered on 28 January

1997 constituted a statement concerning a planned future

conveyance, and did not constitute a conveyance of defendant's

interest in the subject property to his former wife."  628 S.E.2d

at 816.[22]

*Martin* is distinguishable in that regard from this case.  In

the District of Columbia a divorce decree (or a marital

settlement agreement) need not be recorded in order for a

division of property directed by the decree (or the marital

settlement agreement) to have effect.  Here, the *Marital*

*Settlement Agreement* adequately described the Property such as to

be enforceable between the two spouses, and was executed and

incorporated into the *Judgment of Final Divorce* **before** the

divorce took effect*.*  Although the *Marital Settlement Agreement*

contemplated a future sale, it included rights in the parties to

enforce the provisions regarding making a sale of the Property,

for example, by having the Superior Court appoint a trustee to

sell the Property if the parties could not reach agreement

regarding price reductions.  Before the divorce, Barkats and

---

[22]  Under N.C. Gen. Stat. Ann. § 50-20(d):

> Before, during or after marriage the parties may by
> written agreement, duly executed and acknowledged in
> accordance with the provisions of G.S. 52-10 and 52-10.1,
> or by a written agreement valid in the jurisdiction where
> executed, provide for distribution of the marital
> property or divisible property, or both, in a manner
> deemed by the parties to be equitable and the agreement
> shall be binding on the parties.

This is similar to the D.C. Code § 16-910, but D.C. law treats
such agreements as effecting an immediate transfer of ownership
that is effective against third parties whereas North Carolina
law as enunciated in *Martin*, *Faw*, and *Wright* treats such
agreements as effective only after the divorce has converted the
interests into equal tenancy in common shares.

Walker were free to convey the Property to Walker and Barkats
with different shares as tenants in common, and the Ingram
Group's judgment lien would not follow on the share conveyed to
Walker. *See In re Wall's Estate*, 440 F.2d 215, 219 (D.C. Cir.
1971), explaining *Aronstein* 10 F.2d at 992. Unless there was a
fraud on creditors, the conveyance to Walker effected by the
division of the Property could not be avoided.

Here, Webster attempted in this adversary proceeding to set
aside the *Marital Settlement Agreement* as a fraudulent
conveyance as to Barkats' creditors in the bankruptcy case, but
the court dismissed his attempt as untimely, and because it does
not appear that Walker and Barkats owed any joint debts (other
than the liens already paid by Webster) it is doubtful in light
of *Aronstein*, *In re Wall's Estate*, and similar decisions that
there was any fraud as to creditors.[23]

For all of these reasons, I reject the position of the
Ingram Group defendants and Webster that the Property was held by
Walker and Barkats as tenants in common each owning 50% of the
Property.

---

[23] *See Jensen v. Anderson (In re Anderson)*, 561 B.R. 230,
243 (Bankr. M.D. Fla. 2016) (holding that because the debtor and
his wife had no joint creditors, their D.C. tenancy by the
entirety property was not subject to the claims of the debtor's
creditors, and the transfer of the property to a trust was not
subject to avoidance as a fraudulent transfer).

IV

WALKER'S MOTION FOR SUMMARY JUDGMENT

Walker's motion for summary judgment argues that Walker is entitled to $1,818,039.81, but I reject Walker's methodology as being inconsistent with paragraphs 3, 4, and 9 of the *Marital Settlement Agreement* and with the economic reality of the contemplated shares of equity intended under the *Marital Settlement Agreement*. Walker arrives at the $1,818,039.81 figure by first treating the $2,850,000.00 sale as being 69% of the $4,125,000 figure projected by the *Marital Settlement Agreement* and posits that Walker's $2,000,000 share in a full price sale should be reduced to $1,380,000. Under that approach, the $400,000 Trust for Children share would be reduced to $276,000, and Barkats' share of $557,000 would be reduced to $384,330. The three amounts total $2,040,330, which is more than the $1,963,279.94 equity in the Property. Something has to be wrong.

The first error in Walker's methodology is this. The *Marital Settlement Agreement* called for a percentage adjustment based on "the percentage difference between the full listing price **less costs of sale** and the actual selling price **less costs of sale**" (emphasis added). The full listing price sale for $4,125,000 had projected closing costs of $325,000, whereas Webster's sale for $2,850,000 had closing costs of $220,574.61, but a sale also entails paying real estate tax liens and the two

49

HELOC liens.

Recognizing that payouts of $1,380,000 to Walker, $276,000 for the Trust for Children, and $384,330 to Barkats are not possible, Walker treats $181,680.63 as the amount of real estate taxes charged to Webster (as Barkats was responsible for paying the real estate taxes) and calculates that the sum of closing costs and the seller's share of the real estate tax liens was $399,880.56, "which is $74,880.56 more than MSA's assumed closing costs."[24] She acknowledges that under the *Marital Settlement Agreement* these were to be paid off the top. Walker then argues that $24,960.19 (one-third of the $74,880.56) should be charged to the three interests of Walker, the Trust for Children, and Barkats, resulting in Walker being entitled to $1,355,039.81 ($1,380,000 minus $24,960.19), the Trust for Children being entitled to $251,039.81 ($276,000 minus $24,960.19), and Barkats' bankruptcy estate entitled to $359,369.81 ($384,330 minus $24,960.19). However, the *Marital Settlement Agreement* provided for a division between Walker, the Trust for Children, and Barkats in proportion to their projected respective shares of $2,000,000, $400,000, and $557,000 in a $4,125,000 sale after

---

[24] This figure is derived as follows:

```
$220,574.61  - closing costs
$181,680.63  - tax liens,
 ($2,374.68) - credit for prorations of real estate taxes
$399,880.56
```

payment of amounts that had to be paid in full.  Assigning one-
third of the real estate tax liens and closing costs as charges
against each of the three respective shares obviously does not
result in a proportional allocation of proceeds.

Finally, to the Walker's defective $1,355,039.81 figure for
herself, Walker adds the $463,000 in specified loans to arrive at
$1,818,039.81.

Meanwhile, in arriving at the $1,818,039.81 figure, she has
disregarded the two HELOC liens that would have to be paid at
closing.  She argues that those should be treated as paid out of
Barkats' share.  But paragraph 9 of the *Marital Settlement
Agreement* contemplated that these were obligations "which Mr.
Barkats will be paying off from the proceeds of the sale/buyout
of the home."  It did not require that they be paid out of his
share of the proceeds.

For all of these reasons, I will deny Walker's motion for
summary judgment.

V

REMAINING ISSUES EVEN THOUGH THE *MARITAL
SETTLEMENT AGREEMENT* GOVERNS THE DISTRIBUTION OF PROCEEDS

Issues remain even when the *Marital Settlement Agreement* is
used to fix the shares of proceeds.

1.  <u>Ascertaining the Amount Owed Walker Based on Walker's
Entitlement to Receive the Amount of the Specified Loans as They
Increased Over Time</u>.  I have calculated minimum amounts that

51

Walker is entitled to receive for the specified loans based on
what was actually owed on two of the specified loans (the
American Bank Loan and the Access National Bank Loan) and based
on what the *Marital Settlement Agreement* listed as the amounts
owed on the two other specified loans, but the calculation does
not include all of the additional interest that has accrued on
those two other specified loans.  Walker is entitled to
demonstrate what additional interest accrued on those two other
specified loans (and additional interest that has accrued on the
Access National Bank Loan after September 4, 2019 , and
additional interest that would have accrued on the American Bank
Loan if it had not been paid off on August 1, 2014, in light of
that loan having effectively been folded into the new Democracy
Capital Loan used for making the payoff) .  Such a showing would
only increase the amounts available to pay the liens on her share
of the proceeds.

2.   Partial Summary Judgment Regarding Paying the First Five
Liens on Walker's Interest.  Regardless of any additional amount
that Walker is entitled to receive, if the case were decided on
this record, and if my estimate of additional amounts owed on
liens is correct, it would be appropriate to grant partial
summary judgment decreeing that the first five liens listed above
(the first two IRS tax liens, Democracy Capital's lien, the
Atlantic Union lien, and the next IRS tax lien) should be paid in

full with respect to the whatever is owed on those liens.
However, Democracy Capital would be entitled to have a reserve
set aside for any attorney's fees potentially allowed to
Democracy Capital before junior liens are paid).  The IRS,
Democracy Capital, and Atlantic Union ought to file current
statements of the amounts owed on their liens.  Junior lienors,
Webster, and Walker ought to be notified of the amounts to be
paid on the five liens so that they can object to the amounts if
they deem them excessive and notice that objections can be filed
within 17 days after the statements are filed.

3.  <u>Dispute Regarding Democracy Capital's Claim for
Attorney's Fees</u>.  Walker and Democracy Capital have filed papers
regarding Walker's objection to Democracy Capital's claim for
attorney's fees.  That objection warrants an actual hearing.

4.  <u>Must the Amount to be Paid to Walker for the Trust for
Children be Put Into an Actual Trust</u>?  The parties have not
addressed whether the amount to be paid to Walker for the Family
Trust must be placed into an actual trust.  Based on the District
of Columbia Court of Appeals' ruling, it appears that the funds
must be placed in an actual trust, with Walker being entitled to
assert a claim of reimbursement against the trust.[25]

---

[25]  The IRS tax liens will reach the reimbursement amounts
to which Walker is entitled (and the IRS may have the ability to
levy on the trust to seize such amounts), but other lienors'
liens on Walker's interest in the Property might not reach funds
held by the trust or amounts paid out by the trust to Walker.

4.  <u>Joining as Defendants the Two Lienors That Were Not Made
Defendants</u>.  Webster has not addressed the liens of two entities,
Candela Corporation and Direct Capital Corporation, which appear
to have had liens on Walker's interest in the Property but were
not made parties.  If their liens attached to Walker's share of
the proceeds of the sale, he ought to take steps to join them as
parties.

5.  <u>Issue of Whether Candela Corporation's and Direct
Capital Corporation's Liens Attached to the Proceeds of the Sale</u>.
I have not researched whether the liens of Candela Corporation
and Direct Capital Corporation (if they indeed had liens on
Walker's interest in the Property) attached to the proceeds of
the sale or instead remained attached to the Property.

6.  <u>The Purchaser's Damage Claim</u>.  The parties need to
address the claim by the purchaser for a total of $26,050.93 for
damages to the Property which did not exist when he agreed to
purchase the Property, and the position Walker has taken
regarding that claim.

VI

CONCLUSION

It is

ORDERED that the Ingram Group's motion for summary judgment
is DENIED, except that the Ingram Group shall be entitled to
receive 75% of whatever are the proceeds eventually determined to

be property of the bankruptcy estate as Barkats' share of the
proceeds under the *Marital Settlement Agreement* (with Webster
entitled, pursuant to agreement with the Ingram Group, to the 25%
balance), and shall be entitled to seek summary judgment on the
issues that remain.  It is further

ORDERED that Walker's motion for summary judgment is DENIED
but with leave to seek summary judgment on issues that remain.
It is further

ORDERED that the motions for summary judgment filed by other
creditors are denied based on unresolved issues, but with leave
to supplement those motions for summary judgment to address
remaining issues.  It is further

ORDERED that on May 4, 2020, at 10:30 a.m. the court will
hold a telephonic hearing to address Walker's objection to
Democracy Capital's claim for attorney's fees; and to set a
schedule for addressing other unresolved issues.

[Signed and dated above.]

Copies to: All counsel of record; Office of United States
Trustee.