The document below is hereby signed.

Signed: June 9, 2020



_S. Martin Teel Jr._
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                                )
                                     )
PIERRE PHILIPPE BARKATS,             )    Case No. 14-00053
                                     )    (Chapter 7)
            Debtor.                  )
_____        )
                                     )
WENDELL W. WEBSTER, TRUSTEE,         )
                                     )
            Plaintiff,               )
                                     )
       v.                            )    Adversary Proceeding No.
                                     )    18-10021
RONDI WALKER, M.D., _et al._,        )
                                     )    Not for publication in
            Defendants.              )    West's Bankruptcy Reporter.

MEMORANDUM DECISION AND ORDER REGARDING
DR. WALKER'S MOTION TO RECONSIDER, DIRECTING
DISTRICT OF COLUMBIA TO PROVIDE DETAILS REGARDING REAL
ESTATE TAXES PAID UPON THE SALE OF THE REAL PROPERTY AT
ISSUE, AND SETTING DEADLINE FOR PARTIES TO FILE CERTAIN RESPONSES

Dr. Rondi Walker has filed a motion to reconsider (Dkt. No.

185) the court's _Memorandum Decision and Order re Motions for_

_Summary Judgment_ (Dkt. No. 174) ("_Memorandum Decision_")

addressing the proceeds of a sale of residential real property (the "Property") bearing an address at the time of Dr. Walker's divorce of 3232 Garfield Street, N.W., Washington , D.C.  Wendell W. Webster, the Chapter 7 trustee of the estate of the debtor, Pierre Phillipe Barkats, Dr. Walker's former husband, made the sale.  Dr. Walker argues that the court erred in holding that the two HELOC liens, held by US Bank and Atlantic Union Bank,[1] were to be paid off the top in closing the sale and not deducted from the share of the proceeds to which Barkats was entitled under the terms of their *Marital Settlement Agreement*.  For the following reasons, I will sustain Dr. Walker's argument but will also modify the court's prior decision in one regard with respect to real estate tax liens for years after 2012, holding Dr. Walker liable for those tax liens.

I

THE *MARITAL SETTLEMENT AGREEMENT*
ASSUMED THAT A SALE OR ANY BUYOUT
BY DR. WALKER OR BARKATS WOULD BE COMPLETED
REASONABLY PROMPTLY BUT THAT GENERALLY DOES NOT AFFECT HOW
PROCEEDS WERE TO BE DISTRIBUTED UPON A SALE TO A THIRD PARTY

Paragraph 1 of the *Marital Settlement Agreement* required the

---

[1]  A footnote to paragraph 3 of the *Marital Settlement Agreement* executed by Dr. Walker and Barkats specified that the two HELOC liens of $350,000 that were to be paid were a BB&T HELOC loan (later held by U.S. Bank and paid incident to Webster's sale of the Property) and an Access National Bank mortgage loan (which was similarly a HELOC loan) later held by Atlantic Union Bank.  These were paid incident to Webster's sale of the Property.

parties to "promptly take all necessary actions and execute all
necessary documents required to sell and close the sale of the
property" and provided: "Time is of the essence in the sale,
closing and transfer of the property."  It is unlikely that
anyone thought that it would take seven years before the Property
was sold, with interest and late fees or penalties on the real
estate tax liens and the two HELOC liens increasing significantly
over those seven years.  Dr. Walker continued to reside in the
Property,[2] with significant interest and late fees accruing on
the two HELOC loans, and she allowed real estate tax liens on the
Property to increase significantly over the seven years.  The
*Marital Settlement Agreement* did not address whether the reduced
amounts the parties would receive from a long-delayed sale to a
third party (based on increases in the amounts owed for real
estate tax liens and the two HELOC liens) should be adjusted
based on a length of delay neither party contemplated would
occur.  It is tempting to say that it would only be equitable to
charge Dr. Walker with the increases, caused by the delay, in the
amounts owed on liens owed as of the execution of the *Marital
Settlement Agreement* that would have been charged to Barkats'

---

[2] Paragraph 2 of the *Marital Settlement Agreement* included
this provision: "If Dr. Walker is being bought out she shall have
ninety (90) days from the day she receives the buyout amount to
move from the home."  There was no comparable provision regarding
Barkats if Dr. Walker bought him out.  The clear inference is
that Dr. Walker would be the ex-spouse entitled to continue
residing in the Property until it was sold.

3

share upon a sale in 2012.  However, the parties had agreed that
Dr. Walker could continue to live in the Property until it was
sold, and Barkats could have invoked the right to have a trustee
appointed by the Superior Court to sell the Property, but he
failed to do so.[3]  Paragraph 1 generally does not answer the
question of what distributions were to be made to Dr. Walker and
Barkats upon a sale to a third party.

However, as will be seen, the real estate tax liens for
which Barkats was responsible were for 2012.  If Dr. Walker
failed to pay real estate tax liens for later years, there is a
question (addressed later) of who bears responsibility for
payment of those further real estate tax liens.  Paragraph 1, in
making time of the essence, and the parties' apparent
contemplation that a sale would occur relatively promptly, bears
on who should be responsible for tax liens for years after 2012.

II

PARAGRAPH 2 OF THE *MARITAL SETTLEMENT*
*AGREEMENT* DOES NOT ADDRESS THE AMOUNTS BARKATS
WAS REQUIRED TO PAY IF THE PROPERTY WAS SOLD TO A THIRD PARTY

Under paragraph 2 of the *Marital Settlement Agreement*, Dr.
Walker had a right to purchase the Property upon paying Barkats

---

[3]  Paragraph 1 included this provision:

If the parties are unable to reach agreement on price
reductions, the final sale price or the exercise of the
options described in Paragraph 2 below, they shall have
a trustee appointed by the Court complete the sale of the
proprty and the distribution of proceeds.

4

$557,000 *and* satisfying the two HELOC liens, the tax liens, and other debts addressed by the *Marital Settlement Agreement*.  In other words, if Dr. Walker exercised her right to purchase the Property, Barkats would be entitled to $557,000 regardless of the amount of the two HELOC liens and the real estate tax liens. Paragraph 2 included no provision that Barkats was responsible for paying any increase over time of the amount of the two HELOC liens and the real estate tax liens upon Dr. Walker exercising her right to purchase.  If the HELOC liens and real estate tax liens increased significantly in amount, there was no provision that the $557,000 amount he was to be paid would be adjusted by imposing the increases on him.

Webster points to this as demonstrating that the *Marital Settlement Agreement* was envisioning that the respective rights of the spouses would remain essentially the same if there was a delay in the sale, with Barkats not to have his share of net proceeds reduced based on any increase in the amount owed on the two HELOC liens and the real estate tax liens.  However, as noted previously the parties thought the Property would be sold relatively promptly.  With each month a sale was delayed, Dr. Walker's purchase of the Property for $557,000 became less attractive (because of accruals on the real estate tax liens and the two HELOC liens).

As to Barkats' buyout rights, paragraph 2 said "Mr. Barkats

5

will have a one-time option to purchase Dr. Walker's interest in
the property for the $2,863,000 described below."  The $2,863,000
is the sum of three amounts listed in paragraph 3 of the *Marital
Settlement Agreement* that Dr. Walker would receive upon a full
price sale for $4,125,000: $2,000,00 to her directly, plus
$463,000 for loans Dr. Walker had taken out, plus funds of
$400,000 to establish a Trust for Children.  Incident to
exercising his option to purchase the Property, Barkats was *not*
required to pay to Dr. Walker either the $557,000 amount it was
assumed he would net on a sale of the Property for $4,125,000 or
the two HELOC liens.  However, if Barkats exercised his option to
purchase the Property, he would hold the Property encumbered by
the full amount of tax liens and the two HELOC liens, and the
Property would be saddled with the increases in those liens.[4]
Like Dr. Walker's option to purchase the Property,  Barkats'
option to purchase the Property for $2,863,000 would become less
and less attractive over time as accruals increased the amounts
owed on real estate tax liens and the two HELOC liens.

Accordingly, with the passage of time it became more and
more likely that the Property would be sold to a third party.

---

[4]  Although both Dr. Walker and Barkats would remain
personally liable for the two HELOC loans, the Property itself
was likely to retain a value in excess of the two HELOC liens and
real estate tax liens.  If Barkats exercised his option to
purchase the Property, it would remain the primary source for
paying the two HELOC liens and real estate tax liens.

6

Paragraph 2 does not purport to answer what would happen upon a
sale to a third party with respect to any increased amounts owed
on real estate tax liens and the two HELOC liens.  Later
provisions of the *Marital Settlement Agreement* address that
issue.

Paragraph 4 of the *Marital Settlement Agreement* equates the
treatment of the $463,000 in loans specific to Dr. Walker and the
HELOC and real estate tax liens, requiring full payment of each,
including accruals thereon.  In the *Memorandum Decision*, the
court ruled that paragraph 4 requires upward adjustment of Dr.
Walker's share of the sale proceeds to compensate for interest
accrued on the specified personal loans she owed.  Instead of
$463,000, she is to receive $654,141.81.  Arguably it would not
make sense for Dr. Walker to receive the benefit of proceeds of
the sale being used to pay interest accruals on her personal
loans but Barkats not to receive the benefit of proceeds of the
sale being used to pay increased interest accruals on the HELOC
loans and the real estate tax liens, in other words that that
there should be an upward adjustment of Barkats' share to
compensate for the accrual of interest and late fees and
penalties on the amounts owed on the two HELOC liens and real
estate tax liens for 2012.  However, even if that would be
equitable, the parties treated Barkats as solely responsible for
paying the two HELOC liens and the real estate tax liens for

2012, and no part of that was to be borne by Dr. Walker.  The court is bound by what the contract provided, not by what the court thinks would be equitable.

III

PROVISIONS OF THE
*MARITAL SETTLEMENT AGREEMENT* BEARING ON WHETHER IT IS
PROPER TO TREAT THE TWO HELOC LIENS AS A COST OF SALE

In paragraph 3 of the *Marital Settlement Agreement*, the parties agreed how to divide the projected net sales proceeds if the Property sold for the full listing price of $4,125,000.00, as follows:

```
 Net proceeds of sale if sells for gross price of $4,125,000
 less costs of sale (real estate commission, taxes, etc.)  $3,800,000
                                                            (approx.)

 Dr. Walker shall receive                                   $2,000,000
 Plus funds to pay off recent loans she has taken
 for living expenses and Alek's college costs
         $185,000 American Bank
         $148,000 Access National Bank Line of Credit
         $ 30,000 New Logic Loan
         $100,000 - Alek's school loans                    - $463,000
 Plus Funds to establish a Trust for Children              - $400,000

 Gross Balance to Mr. Barkats                                $937,000
 DC Real Estate Taxes on 3232 Garfield Street, NW          -  $30,000
 Less, Payoff liens  (as previously agreed by parties)     - $350,000
    Net to Mr. Barkats                                       $557,000
```

In turn, paragraph 4 of the *Marital Settlement Agreement* provided:

> In the event that the property sells for more or less than the full list price of $4,125,000.00, certain amounts in the full price agreement will be adjusted pro rata, i.e., increased or decreased by the percentage difference between the full listing price less costs of sale and the actual selling price less costs of sale. Loans and tax bills will be paid in full.

8

A footnote specified that the amounts to be adjusted pro rata
were "Dr. Walker's approximately $2,000,000,00 pay out, the
children's trust amount of approximately $400,000.00 and Mr.
Barkats' net payout of $557,000.00."  The $557,000 amount was the
amount left for Barkats out of $937,000 of gross proceeds flowing
to him, after required payments to Dr. Walker, and reduced by the
real estate tax liens of $30,000 and the two HELOC liens.

     Paragraph 9 of the *Marital Settlement Agreement* provided
that "with the exception of the two mortgages (HELOCS) on the
marital home with BB&T and Access National Bank, which Mr.
Barkats will be paying off from the proceeds of the sale/buyout
of the house, the parties agree, they have no marital debt."[5]
Paragraph 9 did not expressly say that Barkats would be paying
off accruals on the two HELOC liens from *his* proceeds of the
sale.  However, reading paragraph 9 in the context of paragraph
3, it is apparent that the payment of the two HELOC liens were to
come from the gross proceeds flowing to Barkats (after payments
to the side of the closing table to be occupied by Dr. Walker and
the Trust for Children).

     Paragraph 10 of the *Marital Settlement Agreement* provided:

---

[5]  The two HELOC liens were likely for loans used to fund
Barkats' business operations, even though they were a joint
liability of Barkats and Dr. Walker.  That likely explains why
the parties provided in paragraph 3 that the two HELOC lients
would be paid from amounts flowing to Barkats after specified
distributions to Dr. Walker.

Each party will be exclusively responsible for all their
own debts.   Mr. Barkats will be solely liable and
responsible for all debts listed on Schedule A attached
hereto . . . .   Dr. Walker shall be solely liable and
responsible for all debts listed on Schedule B attached
hereto . . . .

(Footnote omitted.)   Schedule A listed among the debts for which

Barkats "shall be solely liable" the "2012 DC REAL ESTATE TAXES -

3232 GARFIELD STREET, NW WASHINGTON, DC."

IV

THE TWO HELOC LIENS CANNOT
BE TREATED AS "COSTS OF SALE"

The *Memorandum Decision*, at 17, indicated that the "loans"

to be paid in full were those listed previously under paragraph 3

of the *Marital Settlement Agreement* as the $463,000 of unsecured

loans Walker had taken out.   However, the "loans" to be paid in

full necessarily also included the two HELOC loans.

Dr. Walker argues that the HELOC loans, secured by liens on

the entire Property, are not among the closing costs mentioned in

paragraph 3 of the *Marital Settlement Agreement* (listing "Net

proceeds of sale if sells for a gross price of $4,125,000 less

costs of sale (real estate commission, taxes, etc.)" and ought

not be treated as "closing costs" in paragraph 4.   Real estate

tax liens (dealt with in a later part of paragraph 3) similarly

were not included as "costs of sale" in paragraph 3.   However,

like the two HELOC liens they had to be paid in full to transfer

clear title.

A.   The Error in the *Memorandum Decision*

In the *Memorandum Decision* at 17-21, I concluded that in determining "the percentage difference between the full listing price less costs of sale and the actual selling price less costs of sale" under paragraph 4, the two HELOC loans and the tax liens must be treated as "costs of sale."  However, that was premised on the assumption that there had to be a positive figure left for Barkats upon a pro rata adjustment under paragraph 4 of the $557,000 amount that Barkats was to receive on a full listing price sale.  In other words, the *Memorandum Decision* focused on preserving a semblance of the relative shares of equity the parties would receive upon a full price sale made upon execution of the *Marital Settlement Agreement*.  The error in making that assumption is readily demonstrated by asking what the parties would have received from Webster's sale if it had been at the full listing price.

Upon a sale for the full listing price of $4,125,000, paragraph 4 of the *Marital Settlement Agreement* would not come into play.  For the moment, I will assume, as in the *Memorandum Decision*, that paragraph 3 is treating Barkats as responsible for *all* real estate tax liens, but I later conclude that he was only responsible for real estate tax liens for the year 2012.  If the Property were sold for the full listing price on September 6, 2019, when the actual sale closed, the distributions would have

11

been:

| | |
|---|---|
| Net proceeds of sale if sells for gross price of $4,125,000 less costs of sale (real estate commission, taxes, etc.) | $3,800,000.00[6] (approx.) |
| Dr. Walker shall receive | $2,000,000.00 (approx.) |
| <u>Plus</u> funds to pay off recent loans she has taken for living expenses and Alek's college costs | - $654,141.81[7] |
| <u>Plus</u> Funds to establish a Trust for Children | - $400,000.00 |
| Gross Balance to Mr. Barkats | $745,858.19 |
| DC Real Estate Taxes on 3232 Garfield Street, NW | - $179,305.95 |
| Less, Payoff liens  (as previously agreed by parties) | - $487,186.91 |
| Net to Mr. Barkats | **$ 79,365.33** |

The *Memorandum Decision*, at 32, showed Barkats receiving

**$248,232.24,** upon Webster's selling the Property for the lesser

sale price of $2,850,000, versus the **$79,365.33** Barkats would

receive upon a sale for the higher sale price of $4,125,000.

That cannot be right.  It makes no sense that Barkats would

receive more on a sale for $2,850,000 than he would receive on a

sale for $4,125,000.

---

[6]  I assume that closing costs would be higher upon a sale for $4,125,000 versus the actual sale for $2,850,000, and will assume the costs of sale the *Marital Settlement Agreement* forecast are accurate.

[7]  I assumed in the *Memorandum Decision* that the specified loans to Dr. Barkats would be paid off in full with any increases due to interest and late charges.  Webster has not challenged that conclusion.  At page 32 of the *Memorandum Decision*, I erroneously referred in one passage to the specified loans as standing at $652,141.81 instead of $654,141.81, but that did not affect the calculation made in that passage regarding Barkats' share.

B.   Interpreting the Meaning of the *Marital Settlement Agreement* by Exploring What Would Have Happened if the Property Had Been Sold for $2,850,000 Upon Execution of the Marital Settlement Agreement

What then would be the proper distribution?  For ease of analysis, assume that the sale for $2,850,000 had occurred on April 20, 2012, upon execution of the *Marital Settlement Agreement*.  (This eliminates accruals of interest on various debts, and eliminates real estate taxes for years after 2012 as an issue.)  Paragraph 4 provided for adjustment of Dr. Walker's $2,000,000 share, the Trust for Children's $400,000 share, and Barkats' share of $557,000 by the percentage difference between the full listing price less costs of sale and the actual selling price less costs of sale.  The actual selling price of $2,850,000 less $220,574.61 of costs of sale was $2,629,425.39 or 69.1954% of $3,800,000 (a full listing price less projected costs of sale).  That would result in reducing Dr. Walker's $2,000,000 share to $1,383,908.00; the Trust for Children's share to $276,781.60; and Barkats' share to $385,418.38.  Those amounts total $2,046,107.98.  If a sale for $2,850,000 had occurred upon execution of the *Marital Settlement Agreement* (with no interest having accrued on various debts that were to be paid in full), and the three pro rata adjusted amounts, totaling $2,046,107.98, were paid out of the $2,629,425.39 left after payment of closing costs, only $583,317.41 would be left.  That $583,317.41 would not suffice to pay the $843,000 that had to be paid for the

13

$463,000 of loans to Dr. Walker, the $30,000 of real estate tax liens owed for 2012, and the $350,000 owed for the two HELOC liens.  A shortfall of $259,682.59 would result.  From what is that shortfall of $259,682.59 to be paid?  The *Marital Settlement Agreement* did not expressly answer that question.

For the following reasons, the proper approach would have been to treat Barkats as required to pay the shortall out of his pro rata share of $385,418.38 (69.1954% of $557,000):

- Paragraphs 3 and 9 are best read as requiring Barkats to pay the full amount of the real estate tax liens for 2012 and the two HELOC liens in full, so his pro rata share of $385,418.38 (69.1954% of $557,000) to make up the shortfall of $259,682.59.  The real estate taxes for 2012 were treated as Barkats' sole liability.  Moreover, paragraph 3 treats the real estate taxes for 2012 and the two HELOC liens the same way.  This suggests that, as in the case of real estate taxes for 2012, Barkats is indeed responsible to pay from his pro rata share any shortfall in paying the two HELOC liens.

- As to the loans of $463,000 to Dr. Walker, paragraph 4 specified that "all loans and tax bills will be paid in full" and paragraph 3 showed the loans to Dr. Walker being paid first before any amounts were to be paid to Barkats.  Accordingly, it makes sense that any

14

shortfall in paying those loans would be paid first out of Barkats' pro rata share of $385,418.38 (69.1954% of $557,000).

A sale for $2,850,000 on April 20, 2012, would have produced this result:

| | |
|---|---|
| Net proceeds of sale upon gross price of $2,850,000<br>less costs of sale (real estate commission, taxes, etc.) | $2,629,425.39 |
| Dr. Walker shall receive a pro rata share equal to<br>$1,383,908.00 (69.1954% of $2,000,000) | - $1,383,908.00 |
| Plus funds to pay off loans to Dr. Walker<br>for living expenses and Alek's college costs | - $463,000.00[8] |
| Plus Funds to establish a Trust for Children<br>$276,781.60 (69.1954% of $400,000) | - $276,781.60 |
| Gross Balance to Mr. Barkats | $505,735.79 |
| Less real estate taxes | - $30,000.00 |
| Less, Payoff HELOC liens | - $350,000.00 |
| **Net amount to Mr. Barkats** | **$125,735.79** |

This is less than a 69.1954% pro rata share of a net payout of $557,000, which would equal $385,418.37. However, the parties clearly expected Barkats to pay the then existing amounts of the real estate taxes ($30,000) and the two HELOC liens ($350,000).

What are the consequences for the eventual sale in 2019? Putting aside for the moment the issue of real estate taxes for years after 2012, the foregoing demonstrates that out of the proceeds net of closing costs:

---

[8]   I assumed in the *Memorandum Decision* that the specified loans to Dr. Barkats would be paid off in full with any increases due to interest and late charges.  Webster has not challenged that conclusion.

- Dr. Walker receives $1,383,908.00 (69.1954% of the sale proceeds net of closing costs);

- Dr. Walker is entitled to payment of loans standing at $654,141.81;

- The Trust for Children receives $276,781.60 (69.1954% of the sale proceeds net of closing costs);

- Whatever is left goes first to pay 2012 real estate taxes and the two HELOC liens, and the balance to Barkats.

- If there is a shortfall, Dr. Walker's share of $1,383,908.00 and the Trust for Children's share of $276,781.60 are available to pay the shortfall: Dr. Walker still retains the payment of loans standing at $654,141.81.

I analyze later the issue of real estate taxes for years after 2012, and make a calculation of the distributions to follow based on that analysis.

C.    The Alternative Approach of Treating Any Shortalls as a Cost of Sale is Inappropriate

A different approach is to treat the shortfalls as items that had to be paid off the top as closing costs before calculating the pro rata shares in order to assure that Barkats would receive his pro rata adjusted "net payout of $557,000," and not be hit for the shortfall and largely deprived of the recalculated net payout.  However, other than the reference to

16

the $557,000 as a "net payout" (suggesting that the pro rata adjustment of $557,000 was to be a "net payout" to Barkats) there is nothing in the *Marital Settlement Agreement* that supports that approach, and there are stronger indications that the other approach is what was intended.

First, paragraph 3 plainly does not treat the real estate taxes for 2012, the two HELOC liens, and the $463,000 in loans owed by Dr. Walker as "closing costs" as it separately lists the HELOC liens as being paid from the gross amounts flowing to Barkats. Paragraph 4 calls for certain amounts to be "increased or decreased by the percentage difference between the full listing price less costs of sale and the actual selling price less costs of sale. Loans and tax bills will be paid in full." Paragraph 4 is plainly referring back to the full price scenario projected in paragraph 3, and the "full listing price less costs of sale" plainly means, as stated in paragraph 3, the "gross price of $4,125,000 less costs of sale (real estate commission, taxes [other than the real estate taxes separately listed as being paid from the gross amount flowing to Barkats], etc.)." Obviously the term "costs of sale" appearing in the following clause in the very same sentence of paragraph 4 referring to "the actual selling price less costs of sale" cannot have a different meaning. That the real estate tax liens and the two HELOC liens had to be paid in any event in order to transfer clear title does

17

not make them "costs of sale" as the parties used that term.
Finally, that under this approach the parties' shares of equity
would change over time does not require adopting a different
approach.  Focusing only on the fact that the parties were to
receive pro rata adjusted net payouts if a sale were for a lesser
amount than $4,125,000 would be equivalent to disregarding the
ten-ton gorilla in the room: the necessity that increases in
certain items (the loans Dr. Walker owed, the increases in the
HELOC liens, and any increase in the 2012 real estate taxes) had
to be paid in full, and that paragraph 3 of the *Marital
Settlement Agreement* plainly contemplated that those increases
would come first out of Barkats' share.

Moreover, the approach of treating the shortfalls as a cost
of sale produces a mathematical conundrum.  The shortfalls can
only be calculated once you know what is the "actual listing
price less costs of sale" and what are the consequent pro rata
adjustments to Dr. Walker's $2,000,000 amount, the Trust for
Children's $400,000 amount, and Barkats' $557,000 amount.
However, under this approach it is assumed that the shortfalls
are a component of the costs of sale.  Determining the pro rata
shares would present a difficulty that the parties surely did not
intend.

V

THE ONLY REAL ESTATE TAX LIEN BARKATS WAS
REQUIRED TO PAY WAS FOR REAL ESTATE TAXES FOR 2012

The *Marital Settlement Agreement*, executed on April 20, 2012, contemplated that the Property would be sold relatively quickly, and its paragraph 3 treated Barkats as paying "DC Real Estate Taxes on 3232 Garfield Street, NW - 30,000." Presumably that was the amount of real estate taxes then currently owed for the year 2012. Attachment A treated those real estate taxes for 2012 as a debt for which Barkats "shall be solely liable." Significantly, Schedule A did not list real estate taxes for later years as among the liens for which Barkats would be solely responsible. The *Marital Settlement Agreement* was silent regarding real estate taxes owed for later years and the parties likely thought a sale would occur quickly, with the result those later real estate taxes were viewed as a moot point.

Who should be responsible for paying those real estate taxes for years other than 2012? The lien for those real estate taxes encumber the entirety of the Property, and one might argue that whatever were the respective interests of the ex-spouses in the Property, they ought to bear the real estate taxes on a pro rata basis. However, recall that Dr. Walker was the ex-spouse who was entitled to live in the house until it was sold. Ordinarily you would expect the ex-spouse occupying the former spouses' home to be responsible for paying real estate taxes accruing during that

19

occupancy.  Moreover, after paragraph 10 indicated what debts
each spouse would be solely liable, paragraphs 11 and 12 included
these provisions: "The party who owns or incurred the debt will
indemnify the other party against a third party should a third
party attempt to hold the non-owner party liable. . . .  Each
party will indemnify the other from any liability for any
obligations incurred by him or her."  Nor was Barkats required to
pay future real estate taxes to support Dr. Walker: in paragraph
17 of the *Marital Settlement Agreement* provided that "both
parties waive all claims for spousal support, alimony,
maintenance, or other financial support from the other party."

Subject to Dr. Walker's right to further brief this issue
and persuade me to the contrary, I think that Dr. Walker ought to
be deemed to have incurred the real estate taxes for years after
2012.  The record does not contain evidence as to the amount that
was owed and paid at closing of the sale for real estate taxes
for 2012 versus for years after 2012.  For all we know, the real
estate tax liens for 2012 had been paid some time ago.[9]

As of closing of the sale on September 6, 2019, $181,680.63
in real estate taxes were owed, but Webster was given a credit of
$2,374.68 credit from the purchaser for the period of September

---

[9]  If Barkats paid them, he satisfied his obligation to pay
the real estate taxes for 2012.  If Dr. Walker paid them, she
ought to receive a credit as she satisfied an obligation for
which Barkats was liable.

6, 2019, to October 1, 2019, resulting in Webster paying

$179,305.95 in real estate taxes.  It is obvious that a $30,000

debt for 2012 real estate taxes had not grown in approximately

7.4 years to $181,680.63 as of September 6, 2019.  So there were

real estate taxes owed for years other than 2012 and perhaps even

exclusively for years other than 2012.

If no real estate taxes for 2012 were owed as of the closing

of the sale, the real estate taxes must be subtracted, as an

obligation owed by Dr. Walker, from the pro rata share Dr. Walker

was to receive.  The result would be:

| | |
|---|---:|
| Net proceeds of sale upon gross price of $2,850,000 less costs of sale (real estate commission, taxes, etc.) | $2,629,425.39 |
| Dr. Walker shall receive a pro rata share equal to $1,383,908.00 reduced for $179,305.95 in real estate taxes she incurred = $1,204,602.05 | - $1,204,602.05 |
| Plus funds to pay off recent loans she has taken for living expenses and Alek's college costs | - $654,141.81[10] |
| Plus Funds to establish a Trust for Childr | - $276,781.60 |
| Gross Balance to Mr. Barkats | $493,899.88 |
| Less, Payoff HELOC liens | - $487,186.91 |
| **Net amount to Mr. Barkats** | **$6,712.97** |

However, if Dr. Walker paid the 2012 real estate taxes (which

stood at $30,000 as of April 20, 2012), she would be entitled to

a credit at the closing table, and that credit would wipe out the

$6,712.97 net amount Barkats would otherwise receive.

---

[10]   I concluded in the *Memorandum Decision* that the
specified loans to Dr. Walker would be paid off in full with any
increases due to interest and late charges.  Webster has not
challenged that conclusion.

VI

FURTHER BRIEFING REQUIRED

I will require Dr. Walker to demonstrate why the court ought not enter judgment in accordance with the reasoning of this decision.  Once she responds, other parties should be allowed to respond to her response and to raise any arguments, not previously raised, that the court's new analysis presents.

VII

CONCLUSION

In light of the foregoing, it is

ORDERED that (subject to Dr. Walker's right to attempt to show that Barkats was responsible for real estate taxes for years after 2012):

1.  The two HELOC liens are to be treated as paid first out of Barkats' share of the sale proceeds

2.  Real estate taxes owed for 2012 (and accruals thereon) were an obligation to be paid by Barkats and any unpaid amount was to be paid from Barkats' share of the sale proceeds.

3.  If the gross proceeds flowing to Barkats, after reduction of the $2,629,425.39 (sale proceeds net of closing costs) for:

• Dr. Walker's share of $1,383,908.00 less real estate taxes (and accruals thereon owed for years

after 2012);

- loans to Dr. Walker in the amount of $654,141.81; and

- the Trust for Children's share of $276,781.60

are insufficient to pay in full:

- any real estate taxes for 2012 (and any accruals thereon) still owed at the time of closing; and

- the $487,186.91 owed on the two HELOC liens,

then the shortfall shall be paid proportionately out of:

- Dr. Walker's share of $1,383,908.00; and

- the Trust for Children's share of $276,781.60.

4.  Within 7 days after entry of this *Memorandum Decision and Order*, the District of Columbia shall provide a list of:

- the amounts of real estate taxes (and accruals thereon) owed at the time of closing of the sale for each year starting with 2012 and thereafter; and

- the date and amount of any payment made of real estate taxes for the year 2012.

5.  Within 14 days after entry of this *Memorandum Decision and Order*, Dr. Walker shall file a response hereto to show cause, if any she has, why Dr. Walker was not responsible for paying real estate taxes (and accruals

23

thereon) owed upon closing of the sale of the Property for years after 2012, and why the plaintiff, as trustee of Barkats' bankruptcy estate, is not entitled to receive $6,712.97, and in that response Dr. Walker shall set forth her calculation of what she believes are the appropriate distribution of proceeds of the sale, and shall list:

- the amounts of real estate taxes (and accruals thereon) owed at the time of closing of the sale for each year starting with 2012 and thereafter; and

- the date and amount of any payment she made of real estate taxes for the year 2012.

6.   Within 14 days after Dr. Walker's filing a response (or her deadline for doing so having expired), other parties shall file responses to any response filed by Dr. Walker and to this *Memorandum Decision and Order* showing cause, if any they have, based on any arguments not previously advanced, why the court ought not treat the distribution of proceeds to be governed by this *Memorandum Decision and Order*.

[Signed and dated above.]

Copies to: All counsel of record; Office of United States Trustee.